NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 825, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Respondent.

No. 14331.

United States Court of Appeals Third Circuit.

Argued Oct. 10, 1963.

Decided Jan. 8, 1964.

Solomon Hirsh, N.L.R.B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, James McC. Harkless, Attorney, N.L.R.B., Washington, D. C., on the brief), for petitioner.

John J. Mooney, New York City (Michael Breitkopf, Newark, N. J., on the brief), for respondent.

Before STALEY, HASTIE and SMITH, Circuit Judges.

STALEY, Circuit Judge.

The National Labor Relations Board has found that respondent, Local 825, International Union of Operating Engineers, AFL–CIO, violated § 8(b) (4) (i) and (ii) (D) of the National Labor Relations Act, as amended.[1] More particularly, the Board found that respondent engaged in conduct proscribed by that section with the object of forcing or requiring Nichols Electric Company to assign certain work to it rather than to electricians employed by Nichols. 140 N.L.R.B. No. 48 (1963). The case is here on the Board's petition for enforcement of its order entered pursuant to that determination.

The events giving rise to this dispute occurred at the site of the construction of a reservoir in Clinton, New Jersey. Elmhurst Contracting Company was the general contractor on this project. It subcontracted the drilling and excavation work to Selby Drilling Company. Elmhurst and Selby each had a collective bargaining agreement with respondent in which that union was recognized as the exclusive bargaining representative of all employees engaged in the operation of power equipment specified in a schedule attached to that agreement. Included in the specified list were winch trucks and post hole diggers. Each agreement purported to bind all subcontractors of any

---

1. "§ 158. Unfair labor practices.
* * * * *
"(b) It shall be an unfair labor practice for a labor organization or its agents—
* * * * *
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
* * * * *
"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work * * *." 29 U.S.C.A. § 158 (b) (4) (i) & (ii) (D).

employer who was a party to it and stated that any employer who sublet any of his work did so subject to the terms and conditions of the agreement.

Selby subcontracted the erection of certain electrical transmission lines on the project to Nichols. Nichols had no collective bargaining agreement with respondent; its employees were represented by the International Brotherhood of Electrical Workers ("IBEW"). On May 3, 1961, six of these employees came upon the construction site to erect and wire electrical pole lines. In brief, this requires digging a hole in the ground, standing the pole firmly in it, and stringing electrical transmission lines from pole to pole. As was its usual practice, Nichols proposed to do this with the aid of a line truck equipped with a power-driven auger and winch. In this operation, the auger, which is attached to the rear of the truck, is set in position and, by means of power supplied from the truck or from another source, advances into the hole and removes the dirt. A power driven A-frame and winch is then set in position on the rear of the truck and is used to place the electric line pole into the hole.

As the operation was about to begin, Gatti, the shop steward of Local 825 employed by Elmhurst, informed O'Brien, Nichols' foreman, that the devices could not be operated without operating engineers. When O'Brien disputed this, further discussion was had with Bates, the lead engineer employed by Elmhurst. Bates cited respondent's contract with Selby as showing that the operating engineers were entitled to the work. In the meantime a number of operating engineers gathered around the vicinity of the power auger. At the instance of Bates, two operating engineers were sent to the job site, but O'Brien refused to hire them because the business agent for the electricians had informed him by telephone that the electricians were entitled to the work. O'Brien discussed the problem with Kangas, Selby's job superintendent, who suggested that the holes be dug by hand.

The machines were removed from the job site, and no work was done that day, but the Nichols crew returned on May 9, again with the line truck, to commence drilling operations. Gatti then summoned various operating engineers employed by Elmhurst and Selby and told them to prevent the operation of the auger.[2] The operating engineers gathered around the machine and cited their contract with Selby as indicating that they were entitled to the work. O'Brien again discussed the problem with Kangas who was unable to resolve it with Gatti. Kangas repeated his suggestion that the holes be dug manually. O'Brien removed the machine from the job site, and subsequently completed the digging by hand.

On May 11, 1961, Nichols filed the unfair labor practice charges which resulted in the order of the Board presently under consideration. In addition, Nichols filed other charges alleging that the same conduct on the part of respondent constituted a violation of the secondary boycott provisions of the Act. 29 U.S. C.A. § 158(b) (4) (i) and (ii) (B). The Board agreed, and its petition for enforcement of the order entered in that case was consolidated with this proceeding for the purpose of oral argument in this court. However, though the cases

2. The Board credited the following testimony of O'Brien on this point:

"Q. After he called to these men, what happened? Did you hear what he said to them?

"A. Yes, sir. He told them that 'Here is some men taking bread out of your mouths. Are you going to stand for that? They are taking your work.'

"And of course, there was an agreement that we were taking their work. Mr. Gatti said, 'I want you to gather around the machine so that it doesn't do any more digging.'

"Q. To whom did he say this?

"A. To the Operating Engineers.

"Q. Did they do anything, the Operating Engineers?

"A. They just stood around the equipment."

arise out of the same set of factual circumstances, they pose distinct legal issues which require consideration in separate opinions. Accordingly, except where specifically noted, we deal in this opinion only with the questions raised by the finding of a violation of the jurisdictional dispute section of the statute. 29 U.S.C.A. § 158(b) (4) (i) and (ii) (D).

In accordance with § 10(k) of the Act, 29 U.S.C.A. § 160(k),[3] the Board first conducted a hearing to determine the merits of the jurisdictional dispute. This resulted in a determination that the electricians were entitled to the work. When respondent refused to comply with this determination, the complaint alleging a violation of § 8(b) (4) (i) and (ii) (D) was filed. The parties agreed that the only evidence to be adduced at the hearing on that complaint would be the record in the § 10(k) proceeding, together with the record in the secondary boycott hearing. They further stipulated that the trial examiner should credit the testimony of the General Counsel's witnesses, notwithstanding the testimony of any witnesses for respondent. The trial examiner's finding of a violation of § 8(b) (4) (i) and (ii) (D) was adopted by the Board.

We are met, *in limine*, with respondent's contention that the Board's determination in the § 10(k) proceeding was invalid for the reason that Local 825 had submitted the dispute to the National Joint Board for the Settlement of Jurisdictional Disputes which had rendered a decision assigning the work to the operating engineers. However, Nichols had previously notified the Joint Board that it would not recognize any decision rendered by it, and the IBEW reaffiliated with the Joint Board in 1956 upon the express condition that it would not be bound by decisions involving electrical line transmission work. Accordingly, the Board found that the parties had not agreed upon a method for adjusting their dispute.

In essence, respondent argues that both Nichols and the IBEW were without power to refuse to submit the dispute to the Joint Board because of their affiliation with it. But the rules of that body require contractors first to file a stipulation in which they agree to be bound by the decision of the Joint Board. No such stipulation was filed by Nichols or the contractors' association of which it is a member. Moreover, not only had the IBEW expressed its refusal to be bound by Joint Board decisions of this nature, but the record indicates that it was never notified of the submission of this dispute, nor did it participate in the proceedings. Certainly, in these circumstances, it cannot be held to be bound by the decision rendered by the Joint Board.

On the merits, respondent challenges the Board's determination in the § 10(k) proceeding as arbitrary and capricious. In order to properly evaluate this argument, it is appropriate to first consider the nature of the Board's duty as well as its powers under § 10(k). In National Labor Relations Board v. Radio and Television Broadcast Engineers Union, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L. Ed.2d 302 (1961), the Supreme Court, rejecting the view of the Board, held that § 10(k) requires it to determine the merits of jurisdictional disputes by affirmatively deciding which group of employees is entitled to the disputed work. In discussing the standards to be applied in making these determinations, the Court stated:

"* * * It is true that this forces the Board to exercise under § 10(k) powers which are broad and lacking in rigid standards to govern their application. But administrative agencies are frequently given rather loosely defined powers to cope with problems as difficult as those posed by jurisdictional disputes and strikes. It might have been better, as some persuasively argued in Con-

---

**3.** § 10(k) empowers and directs the Board to hear and determine the dispute, unless the parties submit satisfactory evidence that they have adjusted it, or have agreed upon methods for voluntary adjustment.

gress, to intrust this matter to arbitrators. But Congress, after discussion and consideration, decided to intrust this decision to the Board. It has had long experience in hearing and disposing of similar labor problems. With this experience and a knowledge of the standards generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem, we are confident that the Board need not disclaim the power given it for lack of standards. Experience and common sense will supply the grounds for the performance of this job which Congress has assigned the Board." 364 U.S. at 583, 81 S.Ct. at 336, 5 L. Ed.2d 302.

In accordance with this explication, the Board has articulated its approach to this problem in the following manner:

"At this beginning stage in making jurisdictional awards as required by the Court, the Board cannot and will not formulate general rules for making them. Each case will have to be decided on its own facts. The Board will consider all relevant factors in determining who is entitled to the work in dispute, e. g., the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joint boards, and the AFL–CIO in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business. This list of factors is not meant to be exclusive, but is by way of illustration. The Board cannot at this time establish the weight to be given the various factors. Every decision will have to be an act of judgment based on common sense and experience rather than on precedent. It may be that later, with more experience in concrete cases, a measure of weight can be accorded the earlier decisions." International Ass'n of Machinists, Lodge 1743, AFL–CIO (Jones Construction Co.), 135 N.L. R.B. 1402, 1410–1411 (1962).

In view of these considerations, we must approach this issue with an awareness of the limited scope of judicial review of the Board's award in such matters.

The Board considered a number of factors in deciding that the work should be assigned to the electricians. These included the provisions of the respective collective bargaining agreements, the language of both union constitutions, the determinations of the Joint Board, and the custom and practice in New Jersey.[4] The language of the collective bargaining contracts of both unions, though quite broad, was held not to cover the precise work which is the subject of this dispute. The same conclusion was reached with respect to the union constitutions and with a number of Joint Board awards in favor of the Operating Engineers. With regard to those awards covering the specific operation presented by the case at bar, it was noted that the IBEW had not joined in submitting the disputes to the jurisdiction of the Joint Board.

▮▮ The Board placed considerable emphasis on the fact that it was the uniform custom and practice of electrical contractors in New Jersey to assign this work to electricians. Because these assignments covered the very operation which is the subject of this dispute, the Board considered this evidence to be direct and unequivocal. Respondent argues that this is not a compelling consideration since it is to be expected that electrical contractors would assign this work to electricians who are regularly employed by them. But regardless of the motives of the employer in making such assignments, they are, nonetheless, evidence of custom and practice. In short, under National Labor Relations Board v. Radio and Television Broadcast Engineers, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.

---

4. As the Board noted, none of the parties adduced evidence of custom and practice on a nationwide basis.

▮▮▮

Ed.2d 302, it is the function of the Board and not this court to consider the relevant factors and to weigh and evaluate the evidence adduced with respect to each. Since the Board has done that in this case and as its determination finds support in the record, we cannot say that it has failed to properly perform its statutory duty.

The final contention of respondent is that, assuming, *arguendo,* that an object of the work stoppage was to enforce the subcontract clause contained in its agreements with Elmhurst and Selby, such conduct is lawful under § 8(e) of the Act.[5] This argument is set forth in detail in respondent's brief in the secondary boycott proceeding, but has been incorporated by reference in its brief in the case at bar. We think it appropriate to treat the issue at this point.

 The Board agrees that the subcontract clause is lawful under the construction industry exemption contained in the proviso to § 8(e). But as the Board correctly points out, the Supreme Court has conclusively determined that such a clause, though not unlawful in itself, is no defense to what would otherwise constitute a violation of § 8(b) (4). Local 1976, United Brotherhood of Carpenters v. National Labor Relations Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L. Ed.2d 1186 (1958). Respondent admits that the legislative history of § 8(e) indicates that Congress did not intend to change the existing state of the law when it enacted this provision in 1959. See, e. g., National Labor Relations Board v. International Union of Operating Engineers, Local 12, 293 F.2d 319, 323 (C.A.9, 1961); National Labor Relations Board v. Bangor Building Trades Council,

AFL–CIO, 278 F.2d 287, 290 n. 4 (C.A.1, 1960). However, it seeks to distinguish this case from Local 1976 on the grounds that here the work was to be performed at the job site. We fail to discern any substance in this distinction, for the fact that the work is to be performed at the job site has relevance only in determining whether the clause is within the construction industry proviso to § 8(e), and has no bearing upon the legality of an attempt to enforce it by means prohibited by § 8(b) (4).[6]

The order of the Board will be enforced, and a form of decree may be submitted.

---

5. That section makes so-called "hot cargo" agreements unenforcible and void, but provides a limited exemption for construction industry agreements. 29 U.S. C.A. § 158(e).

6. Respondent also argues that the subcontract clause makes Elmhurst and Selby primary rather than secondary employers. But the undisputed evidence makes it abundantly clear that respondent's primary grievance was with Nichols,

and not with Elmhurst and Selby. In any event, if, as respondent concedes for the purposes of this argument, an object of the work stoppage was to force these employers to cease doing business with Nichols, such conduct is unlawful under the rule of Local 1976, United Brotherhood of Carpenters and Joiners of America, v. National Labor Relations Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).