**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 991, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, Local 1406, International Longshoremen's Association, AFL-CIO and South Atlantic and Gulf Coast District, International Longshoremen's Association, AFL-CIO, Respondents.**

No. 20284.

United States Court of Appeals
Fifth Circuit.
May 20, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lee M. Modjeska, Atty., Arnold Ordman, Gen. Counsel, Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., for petitioner.

Sewall Myer, Houston, Tex., for respondent.

William C. Treanor, New York City, Hugh M. Patterson, V. R. Burch, Jr., Houston, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for Union Carbide Chemicals Co., Division of Union Carbide Corp.

Before HUTCHESON and BROWN, Circuit Judges, and SIMPSON, District Judge.

JOHN R. BROWN, Circuit Judge.

Although this is nominally a petition by the Board for enforcement of its order finding the respondent ILA unions[1] in violation of section 8(b) (4) (i) and (ii) (D) of the Act,[2] the real dispute is whether a previous § 10(k)[3] order assigning work to one union rather than to the ILA is valid.

Union Carbide Chemicals Company manufactures, sells and distributes synthetic organic chemicals and plastics at a 400-acre plant site in Texas City, Texas. During the spring of 1960, Carbide began the construction of dock installations from which it contemplated shipping polyethelene and vinyl resins in specially constructed aluminum containers aboard a modified tanker, the SS *Carbide Seadrift*, which was owned by Carbide. At that time Carbide discussed the manning of these facilities with the Trades Council,[4] the certified bargaining representative of Carbide's 2600 employees in the Texas City plant. The Trades Council took the position that the work at the container dock was covered by the contract between the Trades Council and Carbide, and that Carbide employees in the bargaining unit should perform the work. Carbide agreed and assigned the work to its employees. Then on February 16, 1961, Ralph A. Massey, president of the District ILA wrote Carbide asking for a meeting to discuss the loading and unloading of cargo at the container dock. The position of the ILA with respect to the assignment of the work is clearly stated in the letter—they expected the work to be assigned to longshoremen.[5] Carbide announced its intention to conduct the work by plant employees and

---

1. Local 991, International Longshoremen's Association, AFL-CIO; Local 1406, ILA, AFL-CIO; and Atlantic and Gulf Coast District, ILA, AFL-CIO.

2. National Labor Relations Act, § 8(b) (4) (i) and (ii) (D), 61 Stat. 136, as amended 29 U.S.C.A. § 158(b) (4) (i) and (ii) (D) provides:
   "(b) It shall be an unfair labor practice for a labor organization or its agents— * * *
   "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   " * * * *

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:"

3. 29 U.S.C.A. § 160(k), see note 9, infra.

4. Texas City, Texas, Metal Trades Council, AFL-CIO.

5. The letter stated:
   "As our organization is recognized throughout the U.S. as having jurisdiction over employees engaged in the loading and unloading of these vessels, it is our desire to have a meeting with your company in order to discuss this matter; and * * * to develop an understanding on your contemplated method of operation."

declined to meet with Massey.[6] Needless to say, Massey was not satisfied with Carbide's response. On April 6, 1961, he again wrote to Carbide, asserting ILA jurisdiction and declaring that the ILA expected its members to do the work.[7] On May 15, 1961, Carbide commenced its crane loading operation at the container dock, and on the same day the ILA began picketing the private road leading to the container dock area where the *Seadrift* was berthed. On May 16, 1961, Carbide filed an unfair labor practice charge alleging that the picketing violated § 8(b) (4) (i) (ii) (D) of the Act. The Board requested an injunction pursuant to § 10(l) of the Act,[8] and the picketing ceased on May 22, following termination of the § 10(l) proceedings by entry of an agreed stipulation and order.

Then the Board proceeded to determine the merits of the underlying jurisdictional dispute as required by § 10(k).[9] After the hearing as prescribed by the Board's Rules and Regulations governing § 10(k) proceedings,[10] the Board determined that the regular employees of Carbide's Texas City plant, represented by the Trades Council, are entitled to the loading and unloading work at the container docks. 137 N.L.R.B. 750 (Brown, Member, dissenting). The ILA unions refused to comply with the Board's determination, and the General Counsel issued a complaint on July 13, 1962, charging a violation of § 8(b) (4) (D).[11] The parties waived their rights to a hearing and to the issuance of a Trial Examiner's Intermediate Report and Recommended Order and agreed to submission of the case directly to the Board for disposition. The Board adhered to its previous determination that the work belongs to Carbide employees represented by the Trades Council. This automatically meant, and the Board so found, that the conduct of the ILA violated § 8(b) (4) (i) (ii) (D). The ILA was ordered to post appropriate notices.[12] To effectuate its determination on the

6. The refusal stated:
   "The work currently in progress on these facilities is an extension of shipping functions currently carried on and is an integral part of the plant's operation. As in the past we expect whatever work necessary be performed by Texas City plant employees. This activity has always been intermittent, and we fully expect it to continue to be so.
   "In view of these factors, a meeting at this time would serve no useful purpose."

7. His reply read:
   "I wish to state our organization is not satisfied with the position you have taken in reference to the loading and unloading operation; and, as this classification of work is under the jurisdiction of our organization, we certainly are expecting to have our people do this work and we are going to pursue this matter in the hope that you will reconsider your position and meet with us to draw up an agreement."

8. 29 U.S.C.A. § 160(l).

9. 29 U.S.C.A. § 160(k):
   "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the distpute, such charge shall be dismissed."

10. 29 C.F.R. §§ 102.89–102.93.

11. This procedure is consistent with the Board's Rules and Regulations governing cases of noncompliance with § 10(k) determinations. 29 C.F.R. § 102.91 provides:
   "If, after issuance of the determination by the Board, the parties submit to the regional director satisfactory evidence that they have complied with the determination, the regional director shall dismiss the charge. If no satisfactory evidence of compliance is submitted, the regional director shall proceed with the charge under paragraph (4) (D) of section 8(b) and section 10 of the act * * *."

12. No complaint is made here as to the scope of the order or the remedy imposed. The ILA thus concedes the ap-

underlying work assignment, the Board here seeks enforcement of this order.

■■■ In the CBS case, the Supreme Court held that the Board must determine the merits of an underlying jurisdictional dispute by making an affirmative award of the disputed work in order to discharge its duties under § 10(k) of the Act. NLRB v. Radio & Television Broadcast Eng'rs, Local 1212, IBEW, AFL-CIO, 1961, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302. Prior to the CBS decision, the Board had consistently held that it discharged its duty under § 10(k) by ascertaining whether the *striking union* was entitled to the disputed work by virtue of either an outstanding Board order or certification, or by reason of the terms of a collective bargaining contract. If neither of these conditions was present, the Board took the view that assignment of the work was the prerogative of the Employer. In that event, the dispute was not settled since the Board did not decide that one or the other group of employees was entitled to the work. In short, this approach of the Board was not "conducive to quieting [the] quarrel between [the] two groups." 364 U.S. 573, at 579, 81 S.Ct. 330, 334, 5 L.Ed.2d 302. In order that the § 10(k) proceeding perform its intended purpose of providing "an effective compulsory method of getting rid of what were deemed to be the bad consequences of jurisdictional disputes," 364 U.S. 573, at 582, 81 S.Ct. at 336, the Supreme Court concluded that the Board must determine and settle the dispute by bringing to bear its experience in hearing and disposing of sim-

ilar problems and its knowledge of standards generally used by arbitrators, unions, employers, joint boards and others.[13]

■■ As foreseen by the Supreme Court, "this forces the Board to exercise under § 10(k) powers which are broad and lacking in rigid standards to govern their application." 364 U.S. 573, 583, 81 S.Ct. 336. We recognize, of course, that under such circumstances our review of the Board's award in such matters is limited in scope. NLRB v. Local 825, International Union of Operating Eng'rs, AFL-CIO, 3 Cir., 1964, 326 F.2d 213.[14] However, the discretion of the Board is not unlimited. We have the power, as in § 9(b) cases, to determine "whether there is substantial evidence to support the Board, or its order oversteps the law." Packard Motor Car Co. v. NLRB, 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040. And despite the caveat which suggests the limited scope of such review, the principle just quoted from the Packard case is explicitly adhered to by the Third Circuit in the Operating Eng'rs case. 326 F.2d 213, 218. As the Supreme Court put it last term in another context, "[T]he Board's decisions are by no means immune from attack in the courts * * *." NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, 319 (super-seniority given to strike replacements and strikers who returned to work).

■■■ It is with these principles in mind that we approach review of the Board's award of work to employees of Carbide represented by the Trades Coun-

propriateness of the relief granted if they have violated the Act.

13. In the words of the Court, "Experience and common sense will supply the grounds for the performance of this job which Congress has assigned the Board." 364 U.S. 573, at 583, 81 S.Ct. at 336.

14. The Board also cites, with a good deal of basis, the decisions regulating review of the Board's determinations of appropriate units for bargaining under § 9(b), 29 U.S.C.A. § 159(b), on the theory that

the Board's function in § 10(k) cases is analogous to its function under § 9 (b). See, e. g., Packard Motor Car Co. v. NLRB, 1947, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040; NLRB v. Hearst Publications, Inc., 1944, 322 U.S. 111, 132–133, 64 S.Ct. 851, 88 L.Ed. 1170; May Department Stores Co. v. NLRB, 1945, 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145; NLRB v. Smythe, 5 Cir., 1954, 212 F.2d 664, 668; NLRB v. White Constr. & Eng'r Co., 5 Cir.. 1953, 204 F.2d 950, 952; Texas Pipeline Co. v. NLRB, 5 Cir., 1961, 296 F.2d 208, 212.

cil.[15] This, of course, is the crucial issue in this case. Since there is no independent review of § 10(k) work assignments, the only stage at which the ILA can contest the work award is on review of the § 8(b) (4) (i) (ii) (D) unfair labor practice order. If the § 10(k) order falls, the unfair labor practice order falls with it. The unsuccessful union must therefore acquiesce or take the bold course with its inescapable risk.

■■ The serious challenge to this work award asserted by the ILA is that the Board failed to heed the call of the CBS case and its own Jones Construction Co. case.[16] Following the CBS case, the Board in Jones Construction Co. declared its intention to "consider all relevant factors in determining who is entitled to the work in dispute." 135 NLRB 1402, at 1410. As Member Brown suggests in his dissenting opinion in our case, the Jones Construction Co. policy declaration was consistent with the direction of the CBS case to rely on "experience and common sense" in making work awards in § 10(k) proceedings. The contention of Member Brown and the ILA is that one of the relevant factors—the standard of trade jurisdiction—was not given proper weight in the work award.[17] Although we fully agree that the standard may not be disregarded by the Board, we hold that there is substantial evidence in the record to support the Board's award of work to the employees of Carbide represented by Trades Council.

Carbide ships resin in both liquid and dry states. The liquid resin is pumped from Carbide's plant to dockside storage tanks. From there it is pumped through loading lines into the holds of tankers. This loading activity has been carried on for some 12 years by Carbide employees represented by Trades Council, and the ILA does not dispute the right of Trades Council employees to continue this work.

Shipments of dry resin have been made in 50 pound paper bags, in railroad hopper car containers, in intermediate box containers, and in rubber bag shipping and storage containers. All these containers have been loaded by Carbide employees at the plant for shipment by common carrier.

Of particular importance to this case is the previous handling of shipments of dry resin in paper bag containers. For these shipments, Carbide employed the services of two common carriers by water, Seatrain, Inc. and Pan Atlantic Company[18] who operate the amphibious piggy-back service. Seatrain maintains yard and dock facilities at Texas City. The paper bags were loaded by Carbide's plant employees in empty trailer vans furnished by Seatrain. These trailer vans were brought to the Seatrain yard by a trailer tractor driven by an employee of an outside trucking firm. But employees of the shipper, Carbide, were not permitted to do more. At this juncture longshoremen, represented by ILA in the employ of Seatrain or a steve-

15. In so doing, we categorically reject the suggestion faintly advanced by the Board that "the courts need not concern themselves with a review of the actual merits of the 10(k) award * * *," because the Board is really just an arbiter whose decision is now immune from Court review under the famous trilogy, United Steelworkers v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960,

363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

16. International Ass'n of Machinists, Lodge 1743, AFL-CIO, 1962, 135 NLRB 1402.

17. One commentator suggests that our case "represents not only the first division of the Board members, but the first protest against the failure of the majority to accord sufficient weight to the standard of trade jurisdiction." Cohen, The NLRB and Section 10(k): A Study of the Reluctant Dragon, 14 Labor L.J. 905, 907 (1963).

18. The record reflects only the method of handling utilized by Seatrain.

doring contractor, took over the handling of the bags and the loading of them aboard ship. The typical operation was to lift the van (loaded with bags of resin) off the transporting truck-trailer and onto a cradle for lifting by a specially designed crane for loading into specially designed holds of the ships. Carbide still ships some dry resin in this manner.

The controversy started when Carbide started shipping some dry resin in specially constructed aluminum containers. Under this method of shipment, Carbide does not load the resin into bags as it does for the Seatrain shipments. Rather it loads the dry resin directly into van-sized aluminum containers. The containers are filled at the plant by Carbide employees and hauled on special trailers to the Carbide container dock by tractors operated by an independent company. The containers are lifted by crane from the trailers into the specially prepared hold of the SS *Carbide Seadrift*, the modified tanker owned by Carbide, or they are stored on the dock for later lifting (again by crane) into the ship. This is the work that the ILA contends it should have.

Although the work is physically similar to the loading operating conducted for Seatrain by ILA members, there are significant distinguishing factors. First, the container dock area is adjacent to the "No. 1 oil dock," through which Carbide has for 12 years regularly loaded liquid chemicals on a company tanker, the SS *Wilson*. The contemplated loading procedure for the SS *Carbide Seadrift* is to simultaneously load liquid resins into the vessel's tanks from lines on the "No. 1 oil dock" and dry resin containers from the container dock. As indicated earlier, the ILA does not contend that it should be allowed to conduct the liquid loading operation. The result is that if Carbide employees are used for the work in question, the entire loading operation of the SS *Carbide Seadrift* can be conducted with one crew under one supervision. If ILA employees are used for the dry loading operation, two sets of employees and supervisory personnel will be required to conduct the total loading operation.

Second, the loading operation is typically a two-stage process. The special containers are used as storage receptacles. The dock area is designed so that Carbide can truck the special containers from the plant as they are filled and stack them on the dock. The work at the dock (even when loading and unloading operations are being conducted on the *Seadrift*) is intermittent. Consequently, Carbide has been able to use a crane operator otherwise employed at the plant and also dock operators otherwise employed at the oil dock or in plant maintenance work to accomplish the job. If ILA employees are used for the dry-resin loading operation, they will have to be hired each time containers are sporadically moved to the dock area. Or in any event they will have to be hired when such containers are to be loaded on the *Seadrift*. In either situation the work will be brief with ILA workers being laid off as soon as the particular operation is finished. Third, the Seatrain operation is that of a common or contract carrier who traditionally employs longshoremen for work when and as needed. Carbide is here handling stowing and shipping its own goods on its own vessel.

From this description of the operation, it is clear that even if the traditional jurisdictional claim of the ILA to the work of loading dry cargo aboard seagoing vessels were given extraordinary weight, the Board's resolution could nevertheless favor an award to the employees of Carbide represented by Trades Council. The dual nature of the SS *Carbide Seadrift* as a carrier of both dry and liquid cargo, the ability to conduct the loading of both dry and liquid cargo simultaneously with one crew under one set of supervisory employees, the intermittent nature of the work which makes it desirable to use plant employees which can be otherwise employed when loading operations are not being carried on, all support the

Board's determination. There this phase of our review must end.

Having decided that the work award of the Board must be upheld, we of course enforce the Board's order finding the ILA unions in violation of § 8(b) (4) (i) (ii) (D). The object of the picketing was to force Carbide to assign the work to employees represented by the ILA rather than to the employees of Carbide represented by Trades Council. This the Act proscribes. NLRB v. Radio & Television Broadcast Eng'rs Union, Local 1212, 1960, 364 U.S. 573, 575–576, 81 S.Ct. 330, 5 L.Ed.2d 302; NLRB v. Local 825, International Union of Operating Eng'rs, AFL–CIO, 3 Cir., 1964, 326 F.2d 213; cf. Carey v. Westinghouse Elec. Corp., 1964, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320.

Enforced.