**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION, and Locals 6, 10, 34, 54 and 91, International Longshoremen's & Warehousemen's Union, Respondents.**

No. 21299.

United States Court of Appeals Ninth Circuit.

May 15, 1967.

Rehearing Denied July 3, 1967.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Robert S. Hillman, Attys., NLRB, Washington, D. C., for appellant.

McCutchen, Doyle, Brown, Trautman & Enerson, San Francisco, Cal., for United States Steel Corp.

Norman Leonard, Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., for respondent unions.

Jay Darwin, Darwin, Rosenthan & Leff, San Francisco, Cal., Bredhoff & Gottesman, Washington, D. C., for intervenor, United Steelworkers.

Before JERTBERG and MERRILL, Circuit Judges, and TAYLOR, District Judge.

TAYLOR, District Judge.

The National Labor Relations Board (Board) has petitioned this court for enforcement of its order pursuant to Section 10(e) of the National Labor Relations Act, as amended. 29 U.S.C. §§ 141–187 (Act). The alleged unfair labor practice having occurred in Pittsburg, California, this court has jurisdiction.

Although this is a petition by the Board for enforcement of its order finding the respondents, International Longshoremen's and Warehousemen's Union; and

Locals 6, 10, 34, 54 and 91, International Longshoremen's and Warehousemen's Union (Longshoremen) in violation of Section 8(b) (4) (i) and (ii) (D) of the Act,[1] the real dispute here is whether a previous Section 10(k) order, assigning work to production and maintenance employees represented by the United Steelworkers of America, AFL–CIO, and United Steelworkers of America, Local 1440, AFL–CIO, (Steelworkers) instead of the Longshoremen, was arbitrary and capricious.[2]

The United States Steel Corporation (Company) is a large corporation engaged in the manufacture of steel and steel products at plants located throughout the United States, including a plant at Pittsburg, California. The Pittsburg Works, is a large steel mill which manufactures steel products from steel billets. Prior to 1964 the Pittsburg Works produced its own billets in open-hearth furnaces, these billets being loaded, unloaded and transported to and from storage areas and finishing mills on the premises by Steelworkers. Because of air-pollution regulations, the open-hearth furnaces were shut down in early 1964. In order to continue production at the Pittsburg Works the Company had to transport steel billets from its other plants by rail and by ship. Fifteen-ton billets were brought to the Pittsburg Works from Fairless, Pennsylvania, on the *S.S. Columbia*, a vessel owned and operated by the Company, and used exclusively for carrying billets to the Pittsburg Works. The billets were transported to the Company's dock at the Pittsburg Works, a 400 acre waterfront tract, where the *Columbia* was unloaded by the Steelworkers.

The Company installed two new "whirley" cranes at the Company's dock for the purpose of unloading the vessel transporting the steel billets. Railroad tracks have been installed on the pier, and when the vessel was not in port the same cranes were used to unload material from railroad cars on the pier. The vessel, as well as the railroad cars, were unloaded by the Steelworkers, these employees performing and utilizing the same skills in these operations as they did in their regular assignments throughout the plant in loading and unloading railroad cars, trucks and tractors.

Shortly before the first scheduled landing of the *Columbia* in February, 1964, the Longshoremen advised the Company and the Steelworkers that the Longshoremen claimed the work of unloading the *Columbia*. Representatives of the two unions met and discussed the disputed work assignment. When the Steelworkers maintained they would unload the *Columbia* the Longshoremen threatened to picket and advised the Company of their desire to be assigned the unloading of the *Columbia*.

When the *Columbia* docked on February 19, 1964, the Longshoremen placed pickets at the Pittsburg Works for three days while the ship was being unloaded. The Longshoremen carried signs with legends protesting the work assignment and passed out leaflets presenting the Longshoremen's views on the work assignment. The *Columbia* was unloaded in April, May and July by the Steelworkers and each time the Longshoremen picketed. The May landing of the *Columbia* was delayed five days because it was met with a Longshoremen's picket boat and could not obtain the services of a pilot or a tug. When the *Columbia* did dock five days later, approximately 300 pickets congregated at the plant gates, obstructed access to the plant, making it impossible for the plant's employees to enter for a period of 30 hours. The picketing also stopped deliveries to and from the plant as well as stopping construction work on the plant premises being performed by about 150 employees working for five independent contractors. The mass picketing was discontinued as a result of a state court proceeding on May 14, 1964.

When the *Columbia* returned on July 7, 1964, the Longshoremen resumed pick-

1. Reported at 153 NLRB No. 121.

2. Reported at 150 NLRB 88.

eting at the plant gates with the end result that about 15 plant employees and 175–180 employees of various independent contractors refused to work on the premises. Pursuant to Section 10(*l*) of the Act a temporary injunction was issued against the picketing.

A charge was initiated by the Company and the Board proceeded to determine the merits of the jurisdictional dispute as required by Section 10(k) of the Act. After a hearing the Board determined that the Steelworkers were entitled to unload the Company's cargo from the Company's ships at the Company's dock.

The Longshoremen refused to comply with the Board's determination and the General Counsel of the Board issued a complaint against the Longshoremen alleging a violation of Section 8(b) (4) (i) and (ii) (D) of the Act. By stipulation of the parties the matter was decided by the Board on the basis of the evidence adduced at the hearing in the Section 10(k) proceeding. The Board adhered to its previous determination that the work in dispute belonged to the Steelworkers. This meant, and the Board so found, that the conduct of the Longshoremen violated Section 8(b) (4) (i) and (ii) (D) of the Act. The Board's order requires the Longshoremen to cease and desist from continued violations of Section 8(b) (4) (i) and (ii) (D) of the Act and to post appropriate notices. The Board, in order to effectuate its determination of the underlying work assignment, seeks enforcement of its order.

In N. L. R. B. v. Radio & Television Broadcast Engineers Union, Local 1212, IBEW, AFL-CIO, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961) (Local 1212), the Supreme Court held that the Board must determine the merits of an underlying jurisdictional dispute by making an affirmative award of the disputed work in order to discharge its duties under Section 10(k) of the Act. In International Ass'n of Machinists, Lodge 1743, AFL-CIO, 135 NLRB 1402, 1410–1411 (1961), the Board in accordance with Local 1212, supra, stated its approach to the difficult problem of a work assignment dispute in the following manner:

"At this beginning stage in making jurisdictional awards as required by the Court, the Board cannot and will not formulate general rules for making them. Each case will have to be decided on its own facts. The Board will consider all relevant factors in determining who is entitled to the work in dispute, e. g., the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joint boards, and the AFL-CIO in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business. This list of factors is not meant to be exclusive, but is by way of illustration. The Board cannot at this time establish the weight to be given the various factors. Every decision will have to be an act of judgment based on common sense and experience rather than on precedent. It may be that later, with more experience in concrete cases, a measure of weight can be accorded the earlier decisions."

■ This court recognizes that our review of the Board's award in such matters is limited, but this court does have the power to determine whether there is substantial evidence to support the Board, or if its order is not in accordance with the law. N. L. R. B. v. Local 991, International Longshoremen's Ass'n, AFL-CIO, 332 F.2d 66 (5th Cir. 1964); N. L. R. B. v. Local 825, International Union of Operating Engineers, AFL-CIO, 326 F.2d 213 (3rd Cir. 1964). It is also noted that findings of the Board with respect to questions of fact, shall be conclusive, if supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(e).

■ In accordance with these principles, the court approaches the review of the Board's award of the work in dispute to the Steelworkers. Since there is no independent review of a Section 10(k) work assignment dispute, the only proce-

dure by which the Longshoremen can contest the work award is on review of the Section 8(b) (4) (i) and (ii) (D) unfair labor practice order. If the Section 10(k) order falls, the unfair labor practice order also falls. N. L. R. B. v. Local 991, International Longshoremen's Ass'n, AFL-CIO, supra, 332 F.2d at 71.

The Board considered a number of relevant factors in deciding that the work should be awarded to the Steelworkers. It noted that traditionally the unloading of ships on the Pacific Coast is done by Longshoremen; that this practice was not clearly established in regard to the unloading of cargo from a ship, where the ship, cargo and dock are owned by an employer; that the work in dispute was a new operation and the Steelworkers had been unloading the *Columbia* ever since the new operation began; that the Steelworkers unloaded the ship to the Company's satisfaction and performed the work in a safe manner; that an award of the work to the Longshoremen would have resulted in a loss of jobs to the Steelworkers, who lost 124 jobs when the furnaces were shut down; that an award to the Steelworkers would not entail a job loss to the Longshoremen who did not have and never had a contract with the Company; that the job descriptions of the disputed work were substantially identical with those of other jobs included in the production and maintenance unit covered by the Steelworkers' contract; that the Longshoremen, although being experienced in unloading ships with "whirley" cranes, the Steelworkers were experienced in similar operations with other large rotating cranes; that the Steelworkers were experienced in handling the fifteen-ton billets and the Longshoremen were not experienced in handling billets of this size; that it would have been necessary to transport the Longshoremen a considerable distance for part time employment,

performing work only directly connected with unloading a ship; that the Longshoremen made no claim in regard to the unloading of the railroad cars on the pier; and that the work in dispute complimented the work of the Steelworkers, since they were employed at the premises and were loading and unloading railroad cars with the same cranes.

The Board recognized that there were factors which weighed in favor of the Longshoremen, but in considering all the relevant factors and weighing them, the Board found the work should be awarded to the Steelworkers because of the overriding factors in favor of the Steelworkers. Under the rationale of *Local 1212*, supra, it is the function of the Board to consider all the relevant factors and to weigh and evaluate the evidence adduced in regard to each. After reviewing the record here this court is of the opinion that the Board did perform its function in arriving at its determination and that such determination is supported by substantial evidence.

Having decided that the work award by the Board must be upheld, the Board's order finding the Longshoremen in violation of Section 8(b) (4) (i) and (ii) (D) must be enforced. There is no doubt that the object of the picketing by the Longshoremen was to force the Company to assign the work to the Longshoremen instead of to the Steelworkers. The Longshoremen's only defense to the unfair labor practice charge was an illegal work assignment and that having failed, the order must be enforced. There is no doubt that the Act proscribes that kind of conduct. N. L. R. B. v. Local 991, International Longshoremen's Ass'n, AFL-CIO, supra, 332 F.2d at 73 and cases cited therein.

The petition is granted and the order of the Board will be enforced.