**956**

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ST. LOUIS PRINTING PRESSMEN AND
ASSISTANTS UNION NO. 6, INC., Af-
filiated With International Printing
Pressmen and Assistants Union of
North America, AFL–CIO, Respondent.

No. 18608.

United States Court of Appeals
Eighth Circuit.

Nov. 30, 1967.

Elliott Moore, Attorney, N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, General Counsel, N.L. R.B., Dominick L. Manoli, Associate General Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. General Counsel, N.L. R.B., on the brief.

John S. McLellan, Kingsport, Tenn., for respondent; Morris J. Levin, St. Louis, Mo., and S. Sheldon Weinhaus, St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, BLACKMUN and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

This is a jurisdictional dispute. The National Labor Relations Board seeks enforcement of its order issued October 20, 1965, against the respondent Pressmen's union under § 10(k) of the National Labor Relations Act, 29 U.S.C. § 160(k). The decision and order are reported as 155 NLRB No. 30. The Board's earlier decision determining the dispute was made March 12, 1965, and is reported at 151 NLRB 628.

The employer is Nordmann Printing Company. It is engaged in commercial printing, primarily community and school newspapers, in Saint Louis, Missouri. The unions involved are the respondent, St. Louis Printing Pressmen and Assistants Union No. 6, Inc., affiliated with International Printing Pressmen & Assistants Union of North America, AFL–CIO; St. Louis Typographical Union No. 8, affiliated with International Typographical Union, AFL–CIO; and St. Louis Stereotypers Union No. 8, affiliated with International Stereotypers & Electrotypers Union, AFL–CIO. Prior to June 1964 these three unions respectively represented certain Nordmann employees.

The Board found that the Pressmen had violated § 8(b) (4) (i, ii) (D) of the Act, 29 U.S.C. § 158(b) (4) (i, ii) (D), by threats and coercion with an object of forcing or requiring Nordmann to assign certain work to employees represented by the Pressmen rather than to employees represented by the Typographers.

The facts are not in dispute. In 1963 Nordmann investigated the feasibility of a changeover from letterpress to offset printing methods. This would have a direct impact on employees so far as offset preparatory work was concerned. We need not here describe all the details of letterpress and offset operations and their differences. For present purposes it is sufficient to note the following: Under both methods composing room employees, represented by the Typographers, do the typesetting, make up the page forms, pull proofs, make corrections, and lock the type. The letterpress, a curved press plate, is then made from the flat bed. This operation was performed by employees represented by the Stereotypers; those employees then delivered the curved plate to the pressmen. With an offset press, however, a repro-

duction proof is taken from the flat bed, is photographed, is corrected by opaquing, and is transferred to a flexible metal sheet which becomes the plate for the offset press. It is this work which is in controversy here.

In December 1963 Nordmann ordered a rotary offset press. As it was obligated to do by its several bargaining agreements, Nordmann notified each of the three unions of this fact and thereafter held a meeting with each. Each union then requested that the offset preparatory work be assigned to workers it represented and offered to train company employees in offset practices.

On June 4, 1964, Nordmann by letter notified each union that it had assigned the operation of the offset press to employees represented by the Pressmen and the offset preparatory work to employees represented by the Typographers. This served to eliminate the employees represented by the Stereotypers. All stereotyping equipment was sold and the stereotypers (2 full time and 3 part time) were dismissed. There was, however, no loss of jobs among Nordmann's 10 pressmen and 38 composing room employees. The first offset production job was run about June 10, 1964.

On June 11 a representative of the International Pressmen notified Nordmann that the International had authorized a strike subject to local approval and that their Local would strike Nordmann "if necessary to get the operation of this equipment". The offset preparatory work was formally demanded for pressmen employees by letter written the following day to Nordmann by the president of the Local. Later that day the Local voted a protest strike.

Nordmann responded on June 15 by filing an unfair labor practice charge against the Pressmen. In the meantime, the disputed work has been performed by employees represented by the Typographers. This, apparently, is with the temporary acquiescence of the Pressmen and of the Stereotypers.

For some time the Pressmen's bargaining agreements have been negotiated with the Graphic Arts Association of St. Louis. Nordmann then executes each contract with an addendum specifically covering wages for its employees operating its duplex tubular press. The jurisdictional clause in this contract covers, in addition to the operation of presses, "all work in connection with offset platemaking, including camera operation, all dark room work, stripping, layout, opaquing and platemaking". This language first appeared in the 1958 Pressmen contract and was repeated in subsequent agreements. Nordmann signed the latest in this series of contracts in January 1964 but noted in its letter transmitting that agreement to the Local that a jurisdictional dispute existed.

On the other hand, Nordmann's corresponding contract with the Typographers, concluded in September 1963, provides that that union's jurisdiction "begins with the markup of copy and continues until the material is ready for the printing press (but excluding the making of stereotypes and the burning of offset plates)". Predecessor contracts beginning in 1956 (more than a year before the critical language, described above, first appeared in the Pressmen's contracts) had described the Typographers' jurisdiction in terms of individual jobs, including the composing room classifications "and employees engaged in proofing, waxing and paste-makeup with reproduction proofs [required for offset platemaking], processing the product of photo-typesetting machines, including development and waxing * * * [and] imposition of the paste-makeup serving as the completed copy for the camera used in the platemaking process". The company's negotiator testified at the original hearing that the language in the Typographers' current agreement was a "short form" expression which "continued the same coverage as that originally put into the contract in 1955, inso-

far as its substance was concerned and insofar as it covered the preparatory work processes of offset".

Thus, both the Pressmen and the Typographers, relying on the language of their respective contracts, lay claim to the offset preparatory work.

The record reveals that a press plate can be produced by the photographic method in approximately half the time required by the stereotype method. Nordmann's 38 composing room employees, represented by the Typographers, work in two shifts five days a week. About five of these do the offset preparatory work in an area which adjoins the composing room. When no work is required in the offset area, these employees return to their tasks in the composing room. They are under the same supervision in both places.

The situation as to the 10 Nordmann pressmen is contrasting. Two men work full time on a single shift five days a week. The others work one shift a day, either day or evening, depending on production needs. Thus, it is possible that in as many as five shifts a week no pressman would be at work while the composing room is in operation. The manning requirements of the Pressmen's contract specify the number of workers required to operate a press; if the removal of men for offset preparatory work would reduce the crew below the specified number, the press is to be stopped. If additional pressmen were to be employed exclusively for offset preparatory work, they would stand idle when there was no work of that kind to be done.

In ten other printing plants in the Saint Louis area employees represented by the Pressmen perform all or some of the offset preparatory work. None of these plants prints newspapers. At the two plants, other than Nordmann, which print weekly or community newspapers, employees represented by a lithographers local (not an interested party here) perform the offset preparatory work.

Prior to 1964 the only equipment in use by Nordmann which was related to offset printing was a small multilith press used primarily for letterheads and other small jobs. Two employees represented by the Pressmen operated the commercial department presses where this multilith press was located.

Composing room employees represented by the Typographers attended darkroom instruction courses at the union's local training center before the new equipment was installed. Similar training was offered the company's press operators but only the pressroom foreman took the course.

After Nordmann filed its charge that the Pressmen had violated § 8(b) (4) (i, ii) (D) of the Act, the Board conducted a hearing. In March 1965 it determined that the offset preparatory work was properly assigned to employees represented by the Typographers. It found that both the Typographers and the Pressmen had bargaining agreements which, except for the specification in the Typographers' contract as to the burning of offset plates, assigned the work to to their respective groups; that neither area practice nor prior shop practice afforded significant support to the claim of either group; that employees represented by the Typographers had received training and were performing their tasks adequately while no nonforeman represented by the Pressmen had such training; that the company's assignment resulted in no loss of jobs for either group; and that assigning the work to pressmen would result in less efficient utilization of employees. The Pressmen have refused to comply voluntarily with this determination of the dispute by the Board. Accordingly, the Board issued its October 1965 decision and order concluding that the Pressmen's conduct violated § 8(b) (4) (i, ii) (D) and requiring that union to cease the unfair labor practice and to post the customary notices.

The Pressmen argue that the enforcement of the Board's award of the disput-

ed work is arbitrary and capricious; that it is contrary to the express terms of their contract and to the Board's own rules of decision; and that the award creates a bargaining unit which the Board itself would find inappropriate under § 9 of the Act, 29 U.S.C. § 159. In their brief here, the Pressmen state specifically that they "do not attack the evidentiary basis for the Board's findings", but that they do quarrel with "the astonishing conclusion it reached under a virtually undisputed factual situation". No question is raised as to the qualification of the composing room employees to perform the disputed work.

■■ We may concede, as the Board argues, that in determining a jurisdictional dispute under § 10(k), the Board is required to make an affirmative award of the work. NLRB v. Radio & Television Broadcast Eng'rs Union, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961); NLRB v. Local 991, Int'l Longshoremen's Ass'n, AFL–CIO, 332 F.2d 66, 70 (5 Cir. 1964). We may also concede, as the Pressmen argue, that Board action will not be enforced if it is arbitrary and capricious. NLRB v. Pittsburgh Plate Glass Co., 270 F.2d 167, 174 (4 Cir. 1959), cert. denied 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363; NLRB v. Lord Baltimore Press, 370 F.2d 397, 399 (8 Cir. 1966); S. D. Warren Co. v. NLRB, 353 F.2d 494, 497 (1 Cir. 1965), cert. denied 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300. See Office Employes Int'l Union v. NLRB, 353 U.S. 313, 318–320, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957), and Hotel Employees Local 255 etc. v. Leedom, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958).

[3] It is settled, however, that the Board's area of discretion in disposing of § 10(k) controversies is wide and, indeed, "involves of necessity a large measure of informed discretion", NLRB v. Des Moines Electrotypers' Union No. 84, 291 F.2d 381, 386 (8 Cir. 1961), quoting language employed in Packard Motor Car Co. v. NLRB, 330 U.S. 485,

491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), relating to bargaining units; that the purpose of judicial review is to "guarantee against arbitrary action by the Board", NLRB v. Des Moines Electrotypers' Union, supra, p. 388 of 291 F.2d, where this court quoted the language employed in May Department Stores Co. v. NLRB, 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145 (1945), another bargaining unit case; and that Board action which is not arbitrary will not be disturbed, NLRB v. Local 1291, Int'l Longshoremen's Ass'n AFL–CIO, 368 F.2d 107, 110–111 (3 Cir. 1966), cert. denied 386 U.S. 1033, 87 S.Ct. 1482, 18 L.Ed.2d 595.

■ It has been noted, too, that there are no rigid standards of decision in § 10 (k) matters and that the Board is thus free to resolve these matters on a case-by-case basis where experience and common sense are important factors. NLRB v. Radio & Television Broadcast Eng'rs Union, supra, p. 583 of 364 U.S., 81 S.Ct. 330, 5 L.Ed.2d 302; New Orleans Typographical Union No. 17 v. NLRB, 368 F.2d 755, 762–763 (5 Cir. 1966).

■ With these principles in mind, the present case affords no unusual difficulty. The Board took into consideration the conflicting claims of the respective bargaining agreements, the economic and cost factors which, here, clearly favor the typographers over the pressmen, and the inherent and aquired skills of the respective employee groups. With all this, we cannot say that the Board's determination was arbitrary or capricious or that it is to be disturbed. See NLRB v. Local 1291, Int'l Longshoremen's Ass'n, supra, pp. 110–111 of 368 F.2d, where the Third Circuit approved the Board's giving weight to the contract and to economic considerations, despite some opposing custom in the area; New Orleans Typographical Union v. NLRB, supra, pp. 763–765 of 368 F.2d, where the Fifth Circuit reviewed the factors of contract provisions, skills, custom, trade jurisdiction, and substitution of functions, and found particular support for the Board's determination in efficiency of

operations resting largely in the performance of all necessary work by one group with a single foreman; NLRB v. Local 991, Int'l Longshoremen's Ass'n, AFL–CIO, supra, p. 72 of 332 F.2d where the Board's order was upheld with emphasis upon the performance of work (loading of both dry and liquid cargo simultaneously) with one crew under one set of supervisory employees, and upon "the intermittent nature of the work which makes it desirable to use plant employees which can be otherwise employed when loading operations are not being carried on"; NLRB v. Local Union 3, Int'l Bhd. of Elec. Workers, AFL–CIO, 339 F.2d 145, 148 (2 Cir. 1964), where the court enforced the Board's order which considered type of equipment, past practice of the parties, skills, experience, and economic and cost factors; and NLRB v. Local 825, Int'l Union of Operating Eng'rs, AFL–CIO, 326 F.2d 213, 217 (3 Cir. 1964), where the court upheld a Board order which took into account the contracts, the union constitutions and local custom and practice.

What was done by the Board here strikes us, moreover, as entirely proper and consistent with what was said in the *Radio & Television Broadcast Eng'rs* case. We are particularly impressed with the intermittent character of the offset preparatory work; with the training and ability of the typographers to perform that work and to do so routinely with their other work; with the contrasting possibility, if the work were performed by pressmen employees, of the Nordmann press being occasionally shut down; with the absence of training for this work by pressroom employees; and with the possible need to hire additional pressmen, were the work assigned to them, who would be idle when there was no offset preparatory work to be done.

■ The Pressmen of course contend that their contract with Nordmann clearly gave them jurisdiction over the disputed work. This must be conceded. On the other hand, the Typographers' contract with Nordmann is susceptible

of a like interpretation and, when so construed, chronologically antedates the Pressmen's contractual claim by one year. Under these circumstances (wholly apart, of course, from the issue of any right possessed by the union under § 301 of the Act, 29 U.S.C. § 185), neither contract is conclusive in a § 10(k) proceeding. NLRB v. Local 1291, Int'l Longshoremen's Ass'n, AFL–CIO, 345 F.2d 4, 10 (3 Cir. 1965), cert. denied 382 U.S. 891, 86 S.Ct. 183, 15 L.Ed.2d 149; New Orleans Typographical Union v. NLRB, supra, p. 763 of 368 F.2d.

We are not convinced by the Pressmen's argument that the Typographers' contract did not cover the work in question. It is perhaps true that the Typographers' last agreement might have employed language of greater specificity and that its exclusion of "burning of offset plates" has the character of an out-of-step detail. Any question about coverage, however, is answered by the chronology, the supporting testimony, and the current agreement's otherwise inclusive reference to work which "begins with the markup of copy and continues until the material is ready for the printing press". The Board found, too, that the mechanical burning step occurs about midpoint in offset preparation and is the shortest and simplest operation in that entire process. Thus, the exclusion seems to be an anomaly of no great significance.

The Pressmen further assert that the Board's conclusion is at odds with its own prior determination. Claiming that the Board has consistently reached a contrary result in other situations involving similar contract language, the union cites Tacoma Printing Pressmen's Union (Valley Publishing Company), 131 NLRB 1090 (1961); J. R. Condon & Sons, 148 NLRB 356 (1964); Llewellyn & McKane, Inc., 148 NLRB 269 (1964); Bell Press, Inc., 158 NLRB No. 58; and Kaeser & Blair, Inc., 162 NLRB No. 82 (1967). We regard these cases as consistent with, rather than opposed to, the Board's conclusion, for we feel that, in

those cases, while the Board left the work where the Pressmen's contract indicated, factors other than the contract were present, supportive, and influential. The same is true here but with the opposite result fully supported.

■ Neither are we persuaded by the Pressmen's argument that the Board failed to give sufficient weight to area practice. Although pressmen perform some or all offset preparatory work in ten other printing plants in the Saint Louis area, they do not perform such work in the only two area plants which print newspapers. This is not an inappropriate distinction and, in any event, this factor alone does not, in our view, taint the Board's decision with arbitrariness or capriciousness.

Finally the Pressmen complain that the Board's award of the disputed work resulted in a bargaining unit comprised of letterpress compositors and offset preparatory employees and that this is opposed to the Board's historical and consistent practice of joining offset preparatory employees in the same bargaining unit with offset press personnel. It is said that the Board has given effect to this joinder in more than 200 reported cases, including our own recent decision in NLRB v. Lord Baltimore Press, Inc., supra, 370 F.2d 397. Such action, it is said, is "incontestably at variance with every prior pronouncement by the Board on the subject" and "is as indefensible as it is arbitrary".

■■ The answer to this argument lies in the fact that certification in a representation proceeding is not a jurisdictional award. See Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 269, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). Further, we cannot say that the resulting unit consisted of employees which did not have a recognizable community of interest sufficiently distinct from others. The increasing sophistication of printing methods prevents the grouping from being automatically arbitrary.

The Board's order will be enforced.