335 F.2d 216
 INTERNATIONAL BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA (AFL-CIO) and Carpenters' Local 1849,
United Brotherhood of Carpenters and
Joiners of America, Appellants,
v.
C. J. MONTAGE & SONS, INC., a corporation, et al., Appellees.
C. J. MONTAGE & SONS, INC., a corporation, Carl M.
Halvorson, Inc., acorporation, Austin Construction Co., a
corporation, Babler Bros., Inc., acorporation, and
McLaughlin, Inc., a corporation, Appellants,
v.
INTERNATIONAL BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA et al., Appellees.
INTERNATIONAL BROTHERHOOD OF CARPENTERS AND JOINERS, OF
AMERICA (AFL-CIO) andCarpenters' Local 1849,
United Brotherhood of Carpenters and
Joiners ofAmerica, Appellants,
v.
HOLMAN ERECTION COMPANY, Inc., a corporation, Appellee.
INTERNATIONAL BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA (AFL-CIO) andCarpenters' Local 1849,
United Brotherhood of Carpenters and
Joiners ofAmerica, Appellants,
v.
CURTIS CONSTRUCTION CO., a corporation, Appellee.
 Nos. 18875-18877.
 United States Court of Appeals Ninth Circuit.
 July 14, 1964, Rehearing Denied Aug. 318 1964.
 
 R. Max Etter, Spokane, Wash., for appellants.
 Manley B. Strayer, Robert H. Huntington, Charles J. McMurchie Rockwood, Davies, Biggs, Strayer & Stoel, Portland, Or., for appellee-C. J. Montag & Sons, etc. and others.
 Hart Snyder, McKevitt, Snyder & Thomas, Spokane, Wash., for appellee-Curtis Constr. Co.
 Before HAMLEY, Circuit Judge, MADDEN, Judge of the United States Court of Claims, and JERTBERG, Circuit Judge.
 MADDEN, Judge:
 
 
 1
 These three appeals, which will be treated in one opinion, are from judgments rendered against the appellants by the United States District Court for the Eastern District of Washington, Southern Division. The appellants are the International Brotherhood of Carpenters and Joiners of America (AFL-CIO), and Carpenters Local 1849, located at Pasco, Washington, of the same union. They will be referred to hereinafter as 'International' and 'Local 1849' or, collectively, as the Carpenters. The suits against the two labor organizations, in which suits the judgments appealed from were rendered, were suits based upon 303(a(4) and (b) of the National Labor Relations Act of 1947 (Taft-Hartley Act), 29 U.S.Code 187(a)(4) and (b). That statute said, inter alia, that it is unlawful for a labor organization to engage in a strike the object of which is:
 
 
 2
 'forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work.'
 
 
 3
 The section says, in paragraph (b), that anyone injured in his business or property by a violation of the foregoing provision may sue therefor in any district court of the United States, and may recover the damages by him sustained.
 
 
 4
 In the year 1957 the appellees in No. 18,875, the Montag company and three other companies as joint venture contractors, were engaged in the construction for the United States of a dam on the Snake River near Pasco, Washington. The joint venturers as a group are hereinafter called 'Montag.' The project involved the use of materials worth some $17,000,000. It was called the Ice Harbor Dam project. The appellees in Nos. 18,876 and 18,877 were sub-contractors of Montag on the project. Local 1849 had a collective bargaining contract with Montag with regard to the carpenter work on the project. Other unions had similar contracts with regard to their respective trades. Not long after the commencement of work on the project in January, 1957, there began a continuing controversy between Montag and Local 1849 as to whether, and to what extent, the 'rigging' of certain forms which were to be used in the pouring of concrete on the dam should be done by carpenters or by workmen of another craft.
 
 
 5
 It seems that some of the forms on the project were metal and some were wood. They were fabricated at certain locations on the project, carried to places where cranes were placed, and then were lifted by the cranes to the places where they were to be set up and used to contain the concrete as it was poured. The process of 'rigging' was the 'hooking on' of the fabricated forms to the cranes, the signaling to the operator of the crane that the forms were safely attached and, at the place where the crane was to deposit the forms, the unhooking of the forms from the crane and the signaling to the crane operator that that had been done. Both metal and wooden pieces of forms as well as other materials and tools might be attached to the same load. As early as April, 1957, Montag had assigned the work of rigging the forms to the members of Iron Workers Local 14. Local 1849 having urged that its members should have the work of rigging the wooden forms, and Montag having refused to accede to this demand, Local 1849 caused its members to refuse to work on or handle wooden forms after they had been rigged by the iron workers. This refusal, which began on June 6, 1957, closed down the project, since concrete could not be poured unless forms were placed to contain it. Several hundred carpenters struck, and the other workmen on the project were rendered idle. The purpose of the strike was to compel Montag to assign to the carpenters the rigging of the wooden forms. This strike continued until June 22. Montag did not change the assignment of the rigging work.
 
 
 6
 Again on September 19, 1957, Local 1849 caused a stoppage of the project for the same purpose. The stoppage continued until September 26, but did not achieve its objective. The two stoppages of this large project caused substantial damages to the contractors, and the instant suits were brought to recover those damages.
 
 
 7
 We have quoted, hereinabove, the pertinent language of 303 of the statute. The events which we have recited seem to fit the quoted language and to support the judgment of the District Court. The appellants urge that the statute must not be read literally, that it was intended to apply only to such jurisdictional disputes as involved an active controversy between two unions, the employer being the helpless victim over whose prostrate business the battle was being fought. The appellants say that in this case there was no active controversy between the Carpenters and the Iron Workers' that the Carpenters were merely making a lawful demand upon Montag, and using lawful economic force to obtain what they demanded.
 
 
 8
 Montag and the other appellees reply that the statute may not be read as if it contained a requirement that there be an active dispute between two unions but that, if the statute must be so read, the requirement is fulfilled by the facts of this case. We agree with the appellees' alternative contention that there was in fact an active dispute between two unions, and therefore find it unnecessary to explore their argument for a literal reading of the statute. This case does not resemble at all the case of Penello v. Local Union No. 59, Sheet Metal Workers, 195 F.Supp. 458 (D.C.Del.) upon the excellent opinion in which the appellants rely heavily.
 
 
 9
 We here take note of the Supreme Court's recognition that the draftsmen of the Taft-Hartley Act regarded jurisdictional disputes as a great evil and were bent upon doing all that could be done to cure that evil. In the 1961 case of N.L.R.B. v. Radio and Television Broadcasting Eng. Union, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302, the Court was dealing with the administrative provision of the Act, not here involved. Section 8(b)(4)(D),29 U.S.Code 158(b)(4)(D), defines as an unfair labor practice the same conduct proscribed as unlawful and as a basis for a suit for damages by 303, and 10(k) of the Act, 29 U.S.Code 160(k), provides that when a charge is made that a jurisdictional dispute is being carried on, the National Labor Relations Board
 
 
 10
 'is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen'
 
 
 11
 unless, within ten days after the filing of the charge, the dispute is settled, or an agreement for its settlement has been made by the parties. The Supreme Court held that the Board was obliged to decide that one of the disputants should get the work, even though Congress had given the Board no guide lines whatsoever to be followed in making its decision. This recognition by the Supreme Court that the mood of Congresses was that jurisdictional disputes are intolerable is significant, and teaches us that the damage suit provisions which Congress inserted in the law at the same time that it wrote the above cited provisions for an administrative remedy should not be given a narrow interpretation.
 
 
 12
 It is pertinent here to note that in the District Court the Carpenters urged that their contract with Montag entitled them to the work here in question, and that the statute should not be so interpreted as to make it unlawful to strike to enforce a contract right. The District Court assumed, without deciding, that Montag did breach the contract but that its breach was not a justification for the Carpenters' strike to enforce the contract. We think that it is not necessary to decide that question. The contract on which the Carpenters rely was, at best, vague and uncertain on the point, and subject, to say the least, to a bona fide dispute by Montag. To hold that in such a situation the statutes outlawing jurisdictional disputes are inapplicable would, to a substantial degree, frustrate the purpose of the statutes. It is to be noted that in this appeal the appellants do not pursue this contention.
 
 
 13
 We now consider whether there was a jurisdictional dispute between the Carpenters and the Iron Workers for the work of rigging the wooden forms. As we have seen, Montag, as early as April, 1957, assigned the work to the Iron Workers. It persisted in that assignment throughout the two year period of performance of the contract. The Iron Workers, therefore, had no occasion to complain or to strike about the assignment. They had the jobs. Their national union and the Carpenters' union both being members of the AFL-CIO federation, it was natural that their national officers should engage in friendly discussion with the national officers of the Carpenters. All responsible union officials are aware that jurisdictional disputes and featherbedding are in bad repute, and they try to avoid putting friendly allied unions in the position of engaging in these tactics.
 
 
 14
 During the discussion before the June stoppage, the Iron Workers were asserting their right to keep the work which had been assigned to them. When the stoppage occurred, both unions sent international representatives to the job site to adjust the dispute. On June 20 an agreement was made between the unions and the contractors, under which the men were to return to work and any subsequent jurisdictional disputes were to be settled without work stoppages. Certain additional work was given to the Carpenters. Late in August the representatives of the two unions sought to put into effect a tentative agreement reached by their presidents. This agreement provided that the Carpenters would handle the wood forms and the Iron Workers would handle everything else. Since the Iron Workers would not agree to composite crews, this would have required duplicate crews for the cranes which were handling both wood and metal forms. Montag refused to put this union agreement into effect and filed a protest with the 'Joint Board.' The Joint Board was made up of representatives of unions and contractors. Its full name was National Joint Board for the Settlement of Jurisdictional Disputes.
 
 
 15
 Because of Montag's refusal to put the agreement of the two unions into effect, the September work stoppage occurred. During the stoppage the competing unions recognized that the agreement could not, as written, be put into effect without featherbedding, and directed their representatives to work out an equitable solution. Before such a meeting was held the Carpenters were directed by their International president to return to work. The meeting was held on September 26, but the dispute was not solved because no way could be found to give additional work to the Carpenters without featherbedding the job. The subject was dropped and the work went on as before.
 
 
 16
 Montag sent a telegram to the national office of the Association of General Contractors saying that the only agreement which could be reached would require the appellees to use duplicate crews on the multipurpose cranes when rigging wood forms. This telegram resulted in a further exchange of communications and a telegram from the Joint Board on October 3, 1957, saying:
 
 
 17
 'This office has been assured by Iron Workers and Carpenters Internationals that it is not their intent to use duplicae crews on any rig.'
 
 
 18
 The Joint Board on November 27 issued its decision approving a division of the single work assignment but requiring that this be done in a manner which would not require duplicate crews. The decision also said:
 
 
 19
 'However, when not working on hooking-on, handling and signalling operations, the trades shall proceed with other work as assigned by the contractor.'
 
 
 20
 The chairman of the Joint Board testified in the Montag case that the sentence just quoted was the Board's precaution against featherbedding. When the Joint Board's decision was not put into effect, it, on December 31, 1957, sent a telegram to the parties saying:
 
 
 21
 'Both unions were instructed to assist contractors in executing work performance to eliminate any accuastion of featherbedding. Cooperation is still necessary between contractor and unions involved.'
 
 
 22
 The Joint Board's decision was never put into effect. In a later part of this opinion we shall have occasion to refer to it again.
 
 
 23
 The foregoing narration of events giving rise to these suits seems to us to portray a typical case easily within the purpose of the Taft-Hartley Act's provisions concerning jurisdictional disputes. The fact that one union has the jobs and holds on to them in a polite, non-belligerent manner while the other union uses the forbidden tactics in an effort to get them, or get some of them, does not mean that what Congress regarded as the evils of a jurisdictional dispute are not present. and the fact that the union which has the job is not unwilling that the other union should come in and do some of the work and get paid for doing it, if the first union will still continue to get paid for the work, does not remove the situation from the category of jurisdictional disputes.
 
 
 24
 On this phase of the case our conclusion is that the District Court was right in finding that Carpenters Local 1849 had violated 303(a)(4), 29 U.S.Code 187(a)(4) and in giving the appellees in case No. 18,875 a judgment for its damages. We also conclude that the International Brotherhood of Carpenters and Joiners of America is liable to the same extent as is Local 1849. The District Court so held, finding that the International participated in and encouraged Local 1849 in carrying out its unlawful activity. This finding is well supported by the evidence.
 
 
 25
 We approve the District Court's judgments in Nos. 18,876 and 18,877, except that the judgment in 18,876 should be for $10,000 rather than for 'not less than $10,000.' These companies were subcontractors on the main project, and were damaged by the stoppages caused by the appellants.
 
 
 26
 As to the judgment in favor of Montag, No. 18,875, the appellants object to various items of damages which enter into that judgment. The appellees in that case have appealed from the court's omission from the judgment of various items claimed in their petition, and from the substantial reductions in the amounts of some items. We have considered the contentions of both parties, and approve the action of the trial court in its determination of the items, and the amounts, of Montag's damages. Reference will be made hereinafter to the court's reduction of the Montag judgment by the amount of $40,000 'as mitigation or offset because of a breach of contract by plaintiffs (Montag).'
 
 
 27
 Local 1849 and International each filed a cross-complaint in the Montag case asserting that Montag had refused and was still refusing to comply with the order of the Joint Board of November 27, 1957, and was thereby guilty of a breach of a contract which it had made with the unions, which contract provided:
 
 
 28
 'In the event of conflicting jurisdictional claims, the procedure of the National Joint Board for Settlement of Jurisdictional Disputes shall govern.'
 
 
 29
 Montag, through the Association of General Contractors, had in September of 1957, filed a protest with the Joint Board saying that the arrangements which the Carpenters were insisting upon could not be put into effect without duplicating the crews of riggers. The September stoppage occurred because of the refusal of Montag to accede to the Carpenters demands. The stoppage was terminated by a direction from the International president of the Carpenters that they go back to work. The Iron Workers continued to do the rigging. The Joint Board took the matter under consideration and representations were made to it by the parties. On October 3, 1957, the Joint Board responded to a communication from Associated General Contractors, and said:
 
 
 30
 'This office has been assured by Iron Workers and Carpenters Internationals that it is not their intent to use duplicate crews on any rig.'
 
 
 31
 Montag replied that it did not see how the objective of giving Carpenters a part of the rigging work could be achieved without using composite crews, which the Iron Workers would not permit, or duplicate crews.
 
 
 32
 On November 27, 1957, the Joint Board issued the following decisions with regard to the dispute:
 
 
 33
 'The hooking on, handling and signalling of all wood forms shall be assigned to carpenters. In other respects there is no basis to change the contractor's assignment. However, when not working on hooking on, handling and signalling operations the trade shall proceed with other work as assigned by contractor.'
 
 
 34
 The Chairman of the Joint Board testified in the instant case that, by the third sentence in the decision quoted just above, 'the Board took precautions against featherbedding'; that the sentence was inserted 'so that there could be no accusation of duplicating crews'; that 'by that action any possible possibility of duplicate crews was eliminated.'
 
 
 35
 With due deference to the tribulations of a board of arbitration such as the Joint Board, we think its decision is beyond understanding. Under the decision the crane would be manned by a crew of iron workers. Everything which was to go up, metal forms, tools, and whatever else, except pieces of wood forms, would be hooked on, handled, and signalled by the crew of iron workers. But if a piece of wood form was to go with the load, carpenters would have to be summoned, if they were not standing by while the iron workers were working. If no carpenters, or no carpenters skilled in safely attaching forms to the crane, or in signalling the handling of the crane were nearby, competent carpenters would have to be brought on. Then the iron workers would stand by while the carpenters did their work. This would be, obviously, pro tanto duplication of crews, and pro tanto, featherbedding. In the meantime the crew at the destination of the crane's load would be idle. How the signalling of the operation of the crane would be divided up we have no clear idea.
 
 
 36
 If this case had gone to the National Labor Relations Board for administrative handling under 10(k) of the Act, 29 U.S.Code 160(k), and the Board had made a decision such as the Joint Board made in the case, it would have been the duty of a reviewing court to send the case back to the Board with a direction that it should do its work. N.L.R.B. v. Radio and Television Broadcasting Eng. Union, 364 U.S. 573, 81 S.Ct. 330, mentioned supra herein. A jurisdictional dispute is not 'determined' by attempting to muffle it by a decision which embodies the evils of duplication and featherbedding at the expense of the employer, which Congress sought to eliminate.
 
 
 37
 Montag did not put into effect the decision of the Joint Board. The District Court held that it thereby breached its contract with the Carpenters. Montag says that the Joint Board was not authorized by the agreement between Montag and the Carpenters to make the kind of decision which it made, a decision which did not resolve the jurisdictional dispute but merely gave to each of the disputing unions all that it was asking for and imposed upon Montag the entire cost of the duplication and waste which would have resulted. We think that a fair interpretation of the agreement of the Carpenters and the contractors, in the light of its undoubted purpose, was that the Joint Board was authorized to decide the jurisdictional dispute, and was not authorized to straddle it and leave the whole purpose of the agreement unfulfilled.
 
 
 38
 We conclude that Montag did not breach its agreement with the Carpenters, and that the Carpenters were not entitled to a judgment against Montag even, as the District Court held, for nominal damages. We therefore are not required to decide whether, if Montag had breached its contract with the Carpenters, Local 1849 should have been given a jdugment for the amounts which its members allegedly lost in wages by reason of the breach. On that question, the cases of Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510; Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; and Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246, would have required consideration.[1]
 
 
 39
 One of the District Court's Conclusions of Law was as follows:
 
 
 40
 'Viewing defendants' cross-complaint as an independent cause of action, defendants are not entitled to recover other than nominal damages from plaintiffs as a result of said breach. However, considering the nature of this litigation and all of the surrounding circumstances of this case and the equities of the situation, it is proper and equitable that the plaintiffs' damages should be reduced by the sum of $40,000, which I find to be a reasoanble amount in mitigation of damages.'
 
 
 41
 In another Conclusion of Law the court said:
 
 
 42
 'Defendants are not entitled to recover other than nominal damages from plaintiffs as a result of said breach. However, it is equitable that plaintiffs' damages should be reduced by the sum of $40,000 as mitigation or offset because of said breach of contract by plaintiffs.'
 
 
 43
 The court had determined that the plaintiffs damages were $204,527.55. On the basis of the two conclusions of law quoted just above, it rendered judgment for the plaintiffs for $40,000 less than the amount of plaintiffs' damages, i.e., for $164,527.55. To whatever extent this reduction was related in the mind of the court to the plaintiffs' asserted breach of contract, our conclusion that the plaintiffs did not breach their contract removes that basis for the $40,000 reduction. The court, in the first of the Conclusions of Law quoted above, refers to 'the equities of the situation.' It does not enlighten us as to what equities it had in mind. We think the applicable statute, providing that the victim of a jurisdictional dispute should recover his damages, does not authorize a court to reduce the damages shown by the evidence, because of some unidentified equity. If the court regards the statute as harsh, it should remember that it is the function of Congress to determine whether the measure of damages should be strict or flexible. We hold that the $40,000 reduction embodied in the judgment was erroneous.
 
 
 44
 We affirm the judgment of the District Court in part, and reverse it in part, and remand the case to that court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 See also this court's opinion in International Longshoremen's and Warehousemen's Union v. Kuntz et al., 334 F.2d 165