**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 1291, INTERNATIONAL LONG-SHOREMEN'S ASSOCIATION, AFL-CIO, Respondent.**

No. 14879.

United States Court of Appeals Third Circuit.

Argued Nov. 19, 1964.

Decided April 19, 1965.

Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Asso. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gladys Kessler, Atty., N. L. R. B., on the brief), for petitioner.

Abraham E. Freedman, Freedman, Borowsky & Lorry, Philadelphia, Pa. (Martin J. Vigderman, Philadelphia, Pa., on the brief), for respondent.

Before STALEY, GANEY and FREEDMAN, Circuit Judges.

FREEDMAN, Circuit Judge.

The Board seeks enforcement under § 10(e) of the National Labor Relations Act (29 U.S.C. § 160(e)) of its cease and desist order, entered in a jurisdictional dispute. The order would require Local 1291, International Longshoremen's Association, AFL-CIO, to refrain from seeking to force Northern Metal Company, the employer, to assign certain work related to the loading and unloading of vessels to its own members rather than to members of Local 14, Industrial Union of Marine and Shipbuilding Workers of America, AFL-CIO.[1]

The controversy arises out of rather unusual circumstances. Northern operates a dockside terminal in the Port of Philadelphia for the loading and unloading of ocean-going vessels. Adjoining the piers is a large yard and warehouse. From 1946 until 1951 Northern was primarily engaged in dismantling ships and selling the salvaged scrap. During that time all of the work at Northern's terminal, including the loading and unloading of vessels, was performed by members of Local 14, which was the certified bargaining representative of Northern's maintenance and production employees. In 1951 Northern substantially changed the nature of its business. It discontinued the dismantling and scrapping of ships and began to do stevedoring work. Most of this was by contract with the Army and consisted of loading and unloading military vehicles for shipment overseas; a small amount of its work was the handling of general cargo for private shippers. Before commencing this work for the Army Northern met with representatives of Local 14 and Local 1291 concerning possible jurisdictional problems in carrying out the contract.

---

1. The Board's Decision and Order is reported in 142 N.L.R.B. 1228.

An oral agreement was reached for the division of work between the two unions. Local 14 was to move the vehicles within Northern's terminal to and from the point on the pier where the "hook" on the winch or crane falls to pick up or unload cargo. Local 1291 was given all the remaining work in the loading and unloading of vessels. It was specifically agreed that the longshoremen of Local 1291 would perform their duties in 15-man gangs. A written memorandum of agreement was prepared by Northern, but remained unsigned. After this arrangement was made in 1951 Northern joined the Philadelphia Marine Trade Association (PMTA), the collective bargaining agent for Philadelphia port employers engaged in waterfront activities. Northern thus became subject to the successive collective bargaining agreements made by PMTA with Local 1291 and other locals of ILA. The agreement of PMTA and Local 1291 provided for a minimum gang size of 22 men in loading and discharging "general cargo" and 15-man gangs for cargos of "heavy lift", which require less men because of the use of special hoisting equipment.

Thereafter—from 1951 to 1960—Northern continued the use of 15-man gangs composed of members of Local 1291, in conformity with the 1951 arrangement, even though more than 80% of the Army vehicles it handled were not within the classification of "heavy lift". Northern used the 22-man gangs provided for in the PMTA contract in all its other stevedoring operations when loading general cargo or mixtures of general cargo and vehicles.

In 1960 Northern was awarded a new Army contract for the loading of 30,000 to 60,000 privately owned automobiles of servicemen, referred to as POV's. The POV's were similar in size, weight and method of handling to a great portion of the vehicles which Northern had handled under the previous Army contract with 15-man gangs. Shortly before the first ship was due in port Northern notified Local 1291 that it would use 15-man gangs for this cargo. The Union replied that it would be considered "general cargo" and that unless 22-man gangs were used Northern would have trouble. Northern prevailed on the loading of the first ship, but the Union persisted in its objection and a temporary arrangement was made for the use of 19-man gangs in the loading of the second ship. On the arrival of the third ship a short time later the dispute reached the point where some longshoremen failed to arrive for work. The Union insisted that they would not come to work unless the gangs numbered 22 men for the POV work. After first rejecting this demand, Northern yielded in order to have the work done, but immediately filed a grievance under the PMTA-ILA contract. A hearing was held the following day before a panel consisting of representatives of PMTA and of Local 1291. Local 14 was not notified of the hearing and was not represented. The panel orally decided that under the practice in the Port the handling of automobiles was regarded as general cargo and required 22-man gangs. It recognized the existence of a jurisdictional problem peculiar to Northern because it was the only Port employer which dealt with two separate unions, but stated that it had no power to resolve this problem.[2]

After losing the grievance decision Northern filed an unfair labor practice charge with the Board's regional direc-

2. The Decision was put in the form of a letter a day later. The letter reads, in part, as follows:

"June 22, 1960

* * *

"P.M.T.A. recognizes that there is a problem peculiar to Northern Metal Company as opposed to any other place in the Port of Philadelphia area because the jurisdiction of two different unions are involved. However, P.M.T.A. representatives agree with union representatives on the Grievance Committee that the practice in the port in the handling of automobiles is that a gang of twenty-two men and a foreman are to be employed. If this decision results in jurisdictional problems between I.L.A. and the men from the other union who had jurisdiction over a certain portion of the

tor, alleging that Local 1291 had violated § 8(b) (4) (D) of the National Labor Relations Act (29 U.S.C. § 158(b) (4) (D)) by engaging in a strike and by inducing and encouraging individuals to refuse to perform services for the Company, with the object of forcing or requiring the assignment of the disputed work to the longshoremen it represented rather than to the yardmen represented by Local 14.[3] The Board, having determined after investigation that there was reasonable cause to believe the charge made, held the hearing prescribed by § 10(k) of the Act (29 U.S.C. § 160(k)). It determined that the yardmen of Local 14 were entitled to perform the work of moving vehicles to and from the shore side of the "hook" and that Local 1291 was not entitled to compel the Company to hire 22-man gangs rather than 15-man gangs when this would force it to assign the moving of vehicles to longshoremen rather than yardmen. The Board therefore directed Local 1291 to comply with this determination[4] and on its refusal to do so, general counsel issued a complaint against it. The parties, by agreement, rested on the record in the § 10(k) proceeding. Meanwhile, the Board, acting under § 10(l) of the Act (29 U.S.C. § 160(l)), secured in the District Court a temporary injunction pending its final disposition of the charge. The Court enjoined Local 1291 from encouraging conduct which had as an object the coercion of Northern "to assign the work of moving motor vehicles to be loaded upon or unloaded from ships, to and from the point where such vehicles are taken over by, or released from 'the hook', to employees who are members of * * * Local 1291, * * * rather than to employees who are members of * * * Local 14 * * *." Schauffler for and on Behalf of National Labor Relations Board v. Local 1291, ILA, 188 F.Supp. 203 (E.D.Pa. 1960).[5] This Court affirmed, 292 F.2d 182 (3 Cir. 1961). We held that the finding of the District Court that there was reasonable cause to believe that Local 1291 demanded that Northern assign work to its members rather than to employees represented by Local 14 was supported by substantial evidence. We also rejected the claim that the District Court should have declared at that stage of the case that the PMTA-ILA contract and the grievance panel's decision constituted a legal defense to the charge. Chief Judge Biggs, speaking for the Court, said: "It is apparent that many questions of fact and of law would have had to have been resolved by the court below before it could have determined the precise effect of the PMTA-ILA contract and the June 21, 1960 grievance proceeding on the present controversy. At least some of these questions must be recognized to be other than frivolous in nature. If, in a Section 10(l) proceeding,

work, P.M.T.A. is not empowered to resolve any such jurisdictional dispute and the dispute will have to be handled by the employer's attorney in the same manner as any other jurisdictional problems would be handled."

3. Section 8 of the Act provides:
"* * * (b) It shall be an unfair labor practice for a labor organization or its agents—

&ast;　　　&ast;　　　&ast;　　　&ast;　　　&ast;

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any serv-

ices, where an object thereof is: * * * (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: * * *."

4. See 137 N.L.R.B. 1451.

5. A finding of civil contempt against Local 1291 (Schauffler v. Local 1291, ILA, 189 F.Supp. 737 (E.D.Pa.1960)) was reversed: Id., 292 F.2d 182 (3 Cir. 1961).

a district court or a court of appeals undertook to finally adjudicate such questions it would not be acting consistently with the congressional policy underlying Section 10(*l*). That Section's usefulness as a tool with which the status quo may be preserved pending final adjudication would be diminished insofar as the Board would be required to finally litigate questions of substance at a preliminary stage. Moreover, the court would not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision. Thus, the court would, to some extent, usurp the Board's function as the primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme. * * *" (292 F.2d at p. 188).

The Board has now decided these questions and the problem before us is whether its findings are based upon substantial evidence and if so, whether the charge of unfair labor practice within the meaning of § 8(b) (4) (D) of the Act has been made out.

■ The Board was fully warranted in refusing to accept the claim of Local 1291 that the work stoppage was the spontaneous and isolated action of some of its members but was not the act of Local 1291. Indeed, any other finding would have been contrary to the great weight of the evidence. The real question in the case is whether an "object" of Local 1291's inducement and encouragement of the strike or refusal to work was to force or require Northern, as an employer, "to assign particular work" to members of Local 1291 "rather than to" members of Local 14.

■ Northern filed a so-called "featherbedding" charge under § 8(b) (6) of the Act [6] after the decision of the grievance panel, which it later withdrew. Although "featherbedding" as such is not

before us, the withdrawal of that charge does not limit the scope of the factual inquiry in the present proceeding as to the object of Local 1291 in seeking to compel Northern to increase the size of the gangs handling POV's from 15 to 22 men.

The contention of Local 1291 has an attractive simplicity. Shortly stated it is that it has not sought or coveted any of the work that belongs to employees in Local 14, but seeks only Northern's compliance with its contract with Local 1291. Such compliance, it argues, requires gangs of 22 men because POV shipments constitute general cargo, a matter on which the employer invoked the arbitration machinery provided in the contract and which the grievance panel decided against the employer. Local 1291 insists that it has not sought to break the arrangement by which its members are limited to work on the ship side of the "hook", and that the use of 22-man gangs in harmony with the practice prevailing throughout the Port is a matter of concern between Local 1291 and Northern, which is not in the slightest degree intended to affect Northern's relationship with Local 14.

This contention requires consideration of two elements: (1) was it an object of the effort of Local 1291 to force or require Northern to assign work to its members rather than to employees who were members of Local 14; and (2) if such was the object, how is it affected because the effort was to obtain compliance with Local 1291's contract with Northern.

■ (1) The evidence contained in the printed appendix and in the typewritten proceedings before the hearing examiner of the Board justifies the Board's conclusion that an object of the demand made by Local 1291 was to force or require Northern to give particular

---

6. Section 8(b) (6) of the Act provides: "It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed." (29 U.S.C. § 158(b) (6)).

work to its members rather than to members of Local 14. It is not necessary to narrate this evidence in detail.

The triangular oral agreement among Northern, Local 14 and Local 1291 originated in a meeting called by Northern to make certain that there would be no jurisdictional dispute. The purpose of the negotiations therefore was to settle the jurisdictional claims that the two Locals might have before Northern entered into its contract with the Army and before it joined PMTA. The arrangement made resolved the fundamental elements of a jurisdictional problem. For it fixed the "hook" as the jurisdictional boundary line for the Locals and by limiting the gang size to 15 men it made this boundary line realistic by leaving enough work to be done on the shore side of the "hook" to justify the economic use of the men of Local 14. Thus the geographical and numerical terms of the oral agreement made the settlement of the jurisdictional problems practical for both Locals and for the employer. The fact that the agreement, although reduced to writing, was not signed loses its significance in the circumstances revealed by the record. It was in fact carried out over a period of nine years and thus received a recognition of greater significance than its mere signing would have had. Moreover, it is readily understandable why Local 1291 would not sign the agreement. Contracts of this nature require the signature of the International Vice President in charge of this area. It was one thing to enter into an oral arrangement which established a *modus vivendi* between these two Locals, one of ILA and the other of IUMSWA. It would have been quite another matter for the International Vice President of ILA to have formalized such a jurisdictional settlement, for he also represented a number of other locals in ILA which were in competition with Local 14 of IUMSWA. It is evident that the representatives of ILA were satisfied to establish what was in effect a truce but were reluctant to formalize it in a peace treaty.

A reading of the evidence given by the International Vice President of ILA makes it clear that notwithstanding the arrangement made, ILA continued in the nine years which followed to entertain the desire to take over, both for Local 1291 and for other locals of ILA, the work that was being done by Local 14 of IUMSWA. The evidence shows how this intention cropped out on occasion in overt action. It expressed itself later when Northern complained of the difficulty it would have with Local 14 if it yielded to Local 1291's demand for the use of 22-man gangs on the POV shipments. The evidence justifies the construction which the Board placed on it that at the time Local 1291 in effect offered to solve Northern's problem by taking over the work of Local 14. On a number of occasions after Northern acceded under protest to the use of 22-man gangs, Local 1291 men were observed doing work normally done by Local 14 men. The evidence on this is fragmentary but its implications are significant. There is evidence that jurisdictional disputes existed concerning the handling of motor vehicles, and that there were efforts to establish a new "jurisdictional line" even to the extent of establishing the right of Local 1291 to handle import cargo to the final point of rest.

Finally, the PMTA-ILA contract on which Local 1291 founds the justification for its demands is based on the Port practice under which six or seven men of the 22-man gangs perform work which under the jurisdictional settlement agreement was given to Local 14. Thus, to argue for the Port practice or for compliance with the PMTA-ILA contract or the decision of the grievance panel, is by the very Port usage on which both contract and grievance decision were based, to argue for the doing of the work of six or seven Local 14 men by each 22-man gang of Local 1291 members.

It therefore will not do for Local 1291 to assert that it was indifferent to the effect of its seeking to secure 22-man gangs on the members of Local 14. The

**10**

Board was justified in finding that if a 22-man gang was used there would be approximately seven men in that gang whose work would not be needed if the traditional work of the members of Local 14 was to be done. This amounts to a willingness by Local 1291 to permit approximately seven men to be duplicated in Local 14 and Local 1291, a duplication of job assignments which is not an acceptable means of avoiding a jurisdictional dispute. International Typographical Union, 121 N.L.R.B. 793, 799 (1958); cf. International Brotherhood of Carpenters & Joiners of America v. C. J. Montag & Sons, Inc., 335 F.2d 216 (9 Cir. 1964), cert. denied 85 S.Ct. 719 (1965).

It is clear that an object of the conduct of Local 1291 was to require Northern to assign particular work to its members rather than to members of Local 14.

■ (2) There remains the question whether in the circumstances there was legal justification for what otherwise would constitute a violation of Local 1291 of § 8(b) (4) (D). Mr. Justice Black pointed out in N. L. R. B. v. Radio and Television Broadcast Engineers Union, 364 U.S. 573, 577 n. 12, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961), that the Board had adopted the view that jurisdictional strikes in support of contract rights did not constitute violations of § 8(b) (4) (D) even though it contains no provision for special treatment of such strikes. In doing this the Board sought to encourage the sanctity of the obligation of collective bargaining agreements. Mr. Justice Black pointed out, however, that in jurisdictional disputes the employer usually is the object of conflicting claims by separate unions which have contracts with the employer. It was therefore held in Radio and Television Broadcast Engineers Union that whenever a jurisdictional dispute arises it is the duty of the Board under § 10(k) to determine as swiftly as possible to which of the claimant unions the work belongs and thus relieve the employer of the controversy to which he is innocently subjected because he had contracted with both of them. This determination must be made in the light of the knowledge of the industry and of the surrounding circumstances which would guide arbitrators, employers or joint boards in arriving at similar decisions. (See p. 583, 81 S.Ct. 330). The contract which is one of the elements in the causation of the dispute is, of course, an element to be considered. But it cannot be conclusive, for as already pointed out there usually is more than one contract and it is the competing claims of right under separate contracts which form the origin of the jurisdictional dispute.[7] The Board in its decisions has given consideration to the priority of competing contracts [8] and conduct from which may be inferred a waiver of a subsequent claim of a contrary meaning of a contract.[9]

■ It is in this light that the PMTA-ILA contract must be viewed. Even if its definition of general cargo would jus-

7. "[T]o determine or settle the dispute as between * * * [two or more groups of employees] would normally require a decision that one or the other is entitled to do the work in dispute. Any decision short of that would obviously not be conducive to quieting a quarrel between two groups which, here as in most instances, is of so little interest to the employer that he seems perfectly willing to assign work to either if the other will just let him alone. [The] * * * language [of § 10(k)] also indicates a congressional purpose to have the Board do something more than merely look at prior Board orders and certifications or a *collective bargaining con-* *tract* to determine whether one or the other union has a clearly defined statutory or contractual right to have the employees it represents perform certain work tasks." (P. 579, 81 S.Ct. p. 334) (Italics supplied.) Cf. International Brotherhood of Carpenters & Joiners v. C. J. Montag & Sons, Inc., 335 F.2d 216, 220 (9 Cir. 1964), cert. denied 85 S.Ct. 719 (1965).

8. Tacoma Printing Pressmen's Union, No. 44, 131 N.L.R.B. 1090 (1961); National Broadcasting Co., 105 N.L.R.B. 355 (1953).

9. National Assn. of Broadcast Engineers & Technicians, 110 N.L.R.B. 1233 (1954).

tify a conclusion that POV shipments required 22-man gangs and even if full recognition is accorded to the grievance panel's decision albeit it is clouded by an express reference to the jurisdictional problem, nevertheless in the complete setting of a jurisdictional dispute this one sector of the controversy is not decisive. For what is here involved includes another sector in the problem, the relationship between Northern and Local 14. It is in this light that the absence of Local 14 from the grievance hearing takes on a significance beyond that which normally exists from the lack of notice and an opportunity to be heard. For the parties by their conduct at that time recognized that they were dealing with the rights of Northern and Local 1291 *inter sese* and were not presuming to deal with the rights of Northern and Local 14 or with the correlative obligations between Local 14 and Local 1291 which flowed from their arrangements with Northern. The only solid foundation of consent between Local 14 and Local 1291 was neither their separate contracts with Northern nor the grievance proceedings between Local 1291 and Northern, but rather the triangular arrangement among Northern, Local 1291 and Local 14. In this, the only arrangement among the three, the Board found on ample evidence that the parties arranged for the division of work and for the boundary lines which would mark their activities and avoid a jurisdictional dispute. This agreement fixed their respective rights geographically and in gang size. It satisfied the employer and satisfied the two unions. The parties operated under it for almost ten years. The "hook" became the geographical boundary of the jurisdiction of each union and the limitation of gang size to 15 men was the means by which this was to be carried out, indeed the only means unless there was to be duplication of work.

The subsequent act of Northern in joining PMTA and thereby binding itself to the PMTA-ILA contracts did not alter the jurisdictional relationship. The best proof of this is the fact that the nine or ten year period that followed this action was one in which the triangular arrangement continued.

We do not, of course, decide these factual questions. What we decide is that there is substantial evidence to justify the Board's findings that these are the facts. We agree that on these findings the Board was justified in concluding that Local 1291 should be ordered to cease and desist from continuing to seek 22-man gangs and thereby deprive Local 14 of work for seven of its members.

The order of the Board will be enforced.