**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**Pocahontas Steamship Company, Intervenor,**

**v.**

**LOCAL 1291, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Respondent.**

**No. 15835.**

United States Court of Appeals Third Circuit.

Argued Sept. 30, 1966.

Decided Oct. 27, 1966.

Rehearing Denied Nov. 28, 1966.

Warren M. Davison, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman Levy, Karen Willner, Attys., N. L. R. B., on the brief), for petitioner.

Charles L. Bucy, Washington, D. C., (Gall, Lane & Powell, Washington, D. C., on the brief), for intervenor.

Martin J. Vigderman, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Borowsky & Lorry, Philadelphia, Pa., on the brief), for respondent.

Before HASTIE, SMITH and SEITZ, Circuit Judges.

## OPINION OF THE COURT

HASTIE, Circuit Judge.

The cease and desist order which we are asked to enforce in this unfair labor practice proceeding is based upon a finding by the National Labor Relations Board that the respondent, Local 1291, International Longshoremen's Association, has used coercive means in violation of section 8(b) (4) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b) (4), to compel ship operators, Pocahontas Steamship Co. and Marine Transport Lines, Inc., or the contractors employed by them to load their vessels, to assign the work of opening and closing hatches before and after loading cargoes of coal at the port of Philadelphia to longshoremen represented by the respondent union rather than to seamen, members of the ships' crews. The seamen involved are represented by National Maritime Union (hereinafter designated "NMU") and customarily Pocahontas and Marine Transport have assigned the tasks in question to them.

At an appropriate stage of this controversy the Board conducted a hearing under section 10(k) of the Act and determined that the seamen, rather than the longshoremen, were entitled to this work. However, the respondent refused to be bound by that determination and this unfair labor practice proceeding was carried to final decision against the respondent. We are asked to enforce that decision.

■ The central question now is whether this was a proper case for a section 10(k) determination. Section 10 (k) authorizes the Board "to hear and determine the dispute out of which * * [an alleged section 8(b) (4) (D)] unfair labor practice shall have arisen * *." Section 8(b) (4) (D) deals with coercive conduct by a labor organization for the purpose of "forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another * * *." Thus, on its face, section 10(k) contemplates and is limited to situations in which conflicting claims of two labor organizations with reference to particular work are imposing undue hardship upon the employer. Absent such conflicting union claims there can be no section 10 (k) "dispute" for the Board to determine. Local 1905, Carpet Linoleum and Soft Tile Layers, 1963, 143 NLRB 251; Sheet Metal Workers International Assn., Local 272, 1962, 136 NLRB 1402. The respondent's principal contention is that NMU does not take a position in this case that conflicts with the longshoremen's insistence that they be assigned the hatch and beam work.

While the details of the dispute involving Pocahontas ships are somewhat different from those of the Marine Transport controversy, we find no differences that are decisive. Accordingly, we shall state the facts of the Pocahontas dispute only.

The record shows that at all relevant times labor contracts were in force between the shipowner and NMU under which it was agreed that specified salaries would be paid to the unlicensed seamen assigned to the deck department of Pocahontas crews and that in consideration thereof these seamen would be responsible for various tasks including "hatch and beam" work as required.[1] This work involved the removal and subsequent replacement of hatch covers and was accomplished on the ships in question by electrically powered machinery. There was uncontradicted evidence that a single man, operating electrical controls, could remove the hatch covers or replace them in less than thirty minutes.

For many years it has been the custom and practice at the port of Philadelphia

---

1. The Board found this to be the correct construction of the NMU contract and we agree. Although the respondent disputes this reading of the contract, we find it very persuasive that NMU and the Poca- hontas crewmen have not denied this contract obligation and the crewmen have performed hatch and beam work without protest.

that stevedoring companies, employed by shipowners to load and unload ships, utilize the services of longshoremen, members of the respondent union, for the opening and closing of cargo hatches. Customarily, a specialized gang of six men and a foreman is assigned to a ship for this service. The Philadelphia Marine Trade Association, the bargaining organization for the Philadelphia stevedoring companies, recognizes this work as the responsibility and prerogative of the longshoremen. However, Pocahontas was unwilling to hire longshoremen for this work which members of its crews customarily performed as provided under the NMU labor contract.

In these circumstances, within a four month period, members of the respondent union picketed three Pocahontas ships and prevented each of them from loading until the respondent's hatch and beam gang was hired. Apparently, this gang closed the hatches which the crews had opened and was paid $900 for this unwanted service. Pocahontas then filed the unfair labor practice charge which led to the present proceeding.

While this case was pending NMU advised the Board's Regional Director that it "does not make claim to the work of opening and closing hatches involved in the case". However, there was no refusal of NMU seamen to do this work and no denial by NMU that its contract, which regulated the employment of seamen, obligated the deck crew to do hatch and beam work as required in loading and unloading cargo. The respondent argues that the "disclaimer" by NMU prevents this case from presenting a jurisdictional dispute between the two unions within the meaning of section 10(k) of the Act.

■ From a workman's point of view, the valuable part of a right to a particular job is the right to be paid for it. Thus, a jurisdictional dispute between two groups of employees as to which is entitled to certain work is in essence a dispute as to which shall receive compensation for that work. The opportunity sought to perform labor is significant only as a means of obtaining compensation. It follows that if workmen, who are entitled to a job under the terms of a labor contract, agree to forego the obligation of working but not the concomitant right to payment, they have not disclaimed any significant right. When, as in this case, one group insists that work, for which another group has contracted and is being paid, be assigned it, the fact that both groups are claiming pay for the same work suffices to create a jurisdictional dispute, and it is irrelevant that either group, or both, may manifest a willingness to take the pay and forego the work. See International Brotherhood of Carpenters and Joiners of America (AFL–CIO) v. C. J. Montag & Sons, Inc., 9th Cir. 1964, 335 F.2d 216, 221. Contrast Penello for and on Behalf of N. L. R. B. v. Local Union No. 59, Sheet Metal Workers International Assn., D.Del. 1961, 195 F.Supp. 458, where the union to which an employer proposed to assign work had no contractual right to the work and was not claiming work or attendant pay.

■ Finally, it is argued that the determination awarding the work in controversy to seamen rather than longshoremen is not supportable on the merits. However, we think the Board could properly give substantial weight to the fact that this work was covered by the seamen's contract and was customarily performed by seamen on Pocahontas and Marine Transport ships. The Board also found the seamen competent to do this work. Certainly, the continuation of this assignment would be economical. In this connection, the Board cited "uncontroverted evidence that the cost of hiring an ILA 'hatch and beam' gang was approximately $900", an expense additional to the pay of the seamen who had contracted to do this work. True, there was the countervailing consideration that in connection with the loading and unloading of cargo it was the custom of the port of Philadelphia to employ longshoremen for hatch and beam work. But we cannot say that, weighing these competing considerations, the Board reached a decision

that was arbitrary or without rational justification. Cf. N L R B v. Local 825, International Union of Operating Engineers, 3d Cir.1964, 326 F.2d 213.

Of course, as the Board stated in determining this dispute, "the present award is limited to the particular controversy which gave rise to this proceeding". This decision in no way controls any other dispute over hatch and beam work in which relevant circumstances can be shown to be different.

The order of the Board will be enforced.