**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**New York Stereotypers Union No. 1, International Printing and Graphic Communication Union, AFL–CIO, Intervenor,**

**v.**

**NEW YORK LITHOGRAPHERS AND PHOTOENGRAVERS' UNION NO. 1P, GRAPHIC ARTS INTERNATIONAL UNION, AFL–CIO, Respondent.**

**No. 526, Docket 78–4145.**

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1979.

Decided March 5, 1979.

Joseph P. Norelli, N.L.R.B., Washington, D.C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Edward G. Imperatore, New York City (John D. Feerick, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for intervenor.

Moss K. Schenck, Brooklyn, N.Y., for respondent.

Before OAKES, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

GURFEIN, Circuit Judge:

This petition for enforcement of an order by the National Labor Relations Board in an unfair labor practice proceeding presents for our review the Board's determination of a jurisdictional dispute between two rival unions. The Board has held respondent New York Lithographers and Photoengravers' Union No. 1–P (Lithographers) in violation of § 8(b)(4)(D) of the Labor-Management Relations Act (the Act), 29 U.S.C. § 158(b)(4)(D), because of the Union's refusal to comply with the Board's determination under § 10(k) of the Act, 29 U.S.C. § 160(k), awarding jurisdiction over certain work in the New York Times Co.'s Carlstadt, New Jersey plant to the New York Stereotypers' Union No. 1 (Stereotypers). The Lithographers contest the finding of an unfair labor practice on the ground that the Board's § 10(k) determination is contrary to the clear import of a jurisdictional clause in the Lithographers' collective bargaining agreement which should be deemed controlling. The Board, on the other hand, found that both the Stereotypers and the Lithographers had "colorable" contractual claims to the work, and that other considerations dictated an award in favor of the Stereotypers. We are thus called upon to enter the complex world of jurisdictional warfare between unions in the printing trades, brought on by technological changes in the industry, to determine whether the Board's decision is supported by substantial evidence or, as respondent contends, reflects arbitrary and capricious decisionmaking.

The underlying facts are not in dispute. Prior to August 1975, the New York Times Co. (Times) printed sections of its Sunday newspaper at a plant in New York City on West End Avenue and 65th Street. At this plant, members of the Stereotypers' union performed the task of preparing "press-ready" printing plates. A brief description of the printing and preparation processes used at this time provides a helpful context for analysis of the present dispute. Typographers, members of another union not in-volved in this dispute, received copy for the Sunday editions from several sources, including the Photoengraving Department manned by Lithographers. This material was set by the Typographers in a "chase" —a steel frame designed to hold loose metal type from a linotype machine—to make a first model of each page. The chase was transferred to the Stereotypers at the West End plant, who prepared an impression from the chase called a "mat", which was then used in the Stereotypers Foundry as a mold for making printing plates from molten lead. The type on these plates had measurable relief. After inspection, these "press-ready" plates were sent to the Pressroom where they were used by other employees to print final copy. For each edition, Stereotypers would make as many as thirty plates for each page.

The work of the Lithographers preceded that of the Stereotypers. The Lithographers converted illustrations, photographs, and advertising material into engravings suitable for molding. This was accomplished by photographing artwork or advertising copy and making a single, deep-etched zinc engraving from the negatives through use of a photoelectric process. These engravings were routed, finished, and then mounted onto a base. The completed product was sent to the Composing Room, where Typographers would assemble it along with other material into the chase.

In August 1975, the Times closed its West End plant and transferred the plate-making process for its Sunday editions to its main plant on West 43rd Street. Fabrication of press-ready plates continued to be performed by Stereotypers. In September 1976, the Times again transferred Sunday edition work to a new plant located at Carlstadt, New Jersey. The Carlstadt plant, however, utilized a photo-offset printing process rather than the "hot" letterpress printing process used at West End Avenue and 43rd Street.

In the offset process, "press-ready" printing plates are made from aluminum rather than lead and have no measurable relief.

They are produced by a photoelectric process. Typographers prepare a "paste-up" copy of each page, which is sent to the Lithographers. The Lithographers make a negative of the paste-up which is sent to Carlstadt. At Carlstadt the image of the negative is transferred to a photo-sensitized plate through exposure to ultra-violet light. The plate is developed, preserved and dried. After inspection, it is "crimped" to fit on the presses and delivered to the Pressroom. As in the former letterpress operation, several facsimile plates are required for printing each page.

When the Carlstadt plant was opened, the management of the Times assigned the process of plate-preparation to the Stereotypers. On September 24, 1976, the Lithographers protested this assignment and staged a work stoppage to reinforce their claim to the work. The Times responded by filing unfair labor practice charges under § 8(b)(4)(D), and the Board took jurisdiction of the underlying jurisdictional dispute pursuant to § 10(k) of the Act. Meanwhile, the dispute between the Times and the Lithographers proceeded to arbitration provided for in the Lithographers' collective bargaining agreement. The arbitrator ruled for the Lithographers. The Stereotypers, however, refused to participate in the arbitration, and no party contends that the arbitrator's decision deprived the Board of its jurisdiction. *See Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 272, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 131, 137, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971); *San Diego Stereotypers' Union No. 82,* 201 N.L.R.B. 893, 895 (1973); *Local 1184, Southern Cal. District Counsel [sic] of Laborers,* 192 N.L.R.B. 1078, 1079 (1971). Although both unions are members of the AFL–CIO, there was no resort to that organization's council for resolution of jurisdictional disputes in the printing trades.

The Board rested its decision on a number of the factors which it has deemed relevant to the determination of jurisdictional disputes since *International Ass'n of Machinists, Lodge 1743,* 135 N.L.R.B. 1402, 1410–11 (1962). The Board found initially that each union could point to jurisdictional clauses in its collective bargaining agreement that established a "colorable claim" to the plate work at the Carlstadt plant. The Board thus determined that the factor of contractual right was "neutral." It determined, however, that the customary responsibility of the Stereotypers for plate-making, industry practice in the area, the capacity of either craft easily to master the work, the prior training that Stereotypers had received from the employer and within their own organization, the employer's preference for assignment to Stereotypers, the interests of economy and efficiency, and the fact that an award to the Stereotypers would not interfere with any job currently held by Lithographers, all warranted a determination in favor of the Stereotypers' union.[1]

Respondent does not directly challenge these findings. Instead, it argues that the Board committed a fundamental error when it held that the contractual claims of the two unions were in equipoise.[2] Respondent

1. The Board noted that, by virtue of full employment among the Lithographers and a clause in the Stereotypers' contract protecting members from layoffs if their jobs are eliminated by automation, "the assignment of the work in dispute to the [Lithographers] would require the Employer to continue to employ unneeded stereotypers."

2. Respondent does assert in its brief that skill considerations militate in favor of the Lithographers, and on oral argument respondent's counsel disputed the significance of work assignments in other area newspapers, a factor which the Board considered to favor the Stereotypers. We view these arguments, however, as subsidiary to respondent's main contention that it is entitled to the work as a matter of contract interpretation.

In addition to the issues discussed in text, respondent claims that the Board arbitrarily ignored the decision of the arbitrator who ruled in the Lithographers' favor. The Board did take note of the arbitration proceeding. *New York Lithographers and Photo-Engravers' Union No. 1-P,* 230 N.L.R.B. 425, 426 & n. 1 (1977). Moreover, the Board's decision and that of the arbitrator are not in conflict. The arbitrator noted the pendency of the Board proceeding and recognized that it would have preemptive effect over any determination he

argues that its jurisdictional clause is the *only* one that can be fairly interpreted to cover the work. In the alternative, it argues that even if both unions had colorable claims a comparison of the two claims nonetheless dictates an award in favor of the Lithographers, the other considerations relied on by the Board notwithstanding.

■ As the Supreme Court noted in *NLRB v. Radio & Television Broadcast Engineers Union, Local 1212 (CBS),* 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961), the Board has traditionally adhered to the principle that, in a jurisdictional dispute, " 'to fail to hold as controlling . . . the contractual preemption of the work in dispute would be to encourage disregard for observance of binding obligations under collective-bargaining agreements and invite the very jurisdictional disputes Section 8(b)(4)(D) is intended to prevent.' " *Id.* at 577, 81 S.Ct. at 333, n. 12, *quoting National Ass'n of Broadcast Engineers,* 105 N.L.R.B. 355, 364 (1953). But, as the Court has also noted, such clear contractual preemption is not always present, particularly when a new circumstance, such as technological change, forces the realignment of work arrangements. *Transportation-Communication Employees Union v. Union Pacific R.R. Co.,* 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966) (Railway Labor Act). In such a case, it is unlikely that a single contract can be conclusive, for there "usually is more than one contract and it is the competing claims of right under separate contracts which form the origin of the jurisdictional dispute." *NLRB v. Local 1291, Int'l Longshoremen's Ass'n,* 345 F.2d 4, 10 (3d Cir.), *cert. denied,* 382 U.S. 891, 86 S.Ct. 183, 15 L.Ed.2d 149 (1965) (footnote omitted). *See also New Orleans Typographical Union No. 17 v. NLRB,* 368 F.2d 755, 763 (5th Cir. 1966). The Board thus properly considered its first duty to be to determine whether only one or both of the collective bargaining agreements involved in this dispute covered the work at the Carlstadt plant.

■■ We think that the Board operated within its discretion in determining that both collective bargaining agreements presented colorable contractual claims. In the case of the Lithographers, the coverage is crystalline. Section 21 of the agreement provides that "[n]othing contained herein, however, shall take away from the Union its right of jurisdiction over any new machinery or equipment used in the photo-engraving process which may be introduced, including plate-making equipment for publication of a newspaper by the offset process." In addition, the agreement defines photo-engraving as including " . . . the operation of electronic plate making devices and machines that substitute for the original engraving process . . . ." The contractual claim of the Stereotypers is less obviously clear. Yet, section 5 of the collective bargaining agreement defines the work processes covered by the contract to include "such other designations as may be applied to any process for duplicating plates, cylinders or any other duplicate method for printing," and it is further agreed that the employer will recognize jurisdiction of the Stereotypers over "any system, process, method or equipment . . . which the publisher may adopt or install within the jurisdiction of the union as a substitute for or as an addition to any system, process, method or equipment now being manned by its stereotypers." Since the platemaking at Carlstadt is a "process for duplicating plates", and since it was clearly introduced as a substitute for the processes used at the West End plant and manned by Stereotypers, we cannot say that the Board was in error in finding a "colorable" contractual claim in the Stereotypers' contract.

might reach. Nonetheless, he reasoned that he should proceed because "[t]he fact . . . that this contractual determination is not binding upon the National Labor Relations Board as to the exercise of its statutory controls under Section 8(b)(4)(D) and Section' 10(k) of the NLRA does not, of itself, prevent the Union from pursuing separate contractual remedies whatever the finality of those remedies may be." The arbitrator limited himself to the issue of whether *under its contract* the Lithographers· had a jurisdictional claim. The Board fully agreed with the arbitrator's affirmative conclusion.

It is apparently not unusual for the Board in jurisdictional disputes to hold that conflicting contractual claims neutralize one another. *See, e. g., Dunkirk Printing Pressmen & Assistants' Union No. 191,* 221 N.L.R.B. 1064 (1975); *Graphic Arts Union No. 67,* 220 N.L.R.B. 1167, 1170 (1975); *Local 1184, Southern Cal. District Counsel [sic] of Laborers, supra,* 192 N.L.R.B. 1078, 1080 (1971). Because the relative significance of competing contractual claims must be assessed in light of trade history and usage as well as the vagaries of the collective bargaining process, we defer in that regard to the Board's particular expertise. This court has stated on a prior occasion that "it is not for us to determine the exact weight to be accorded to each of [the] factors [efficiency and economy]" to be considered in a § 10(k) proceeding. *NLRB v. Local No. 25, International Bhd. of Elec. Workers,* 396 F.2d 591, 594 (2d Cir. 1968). Particularly in an industry like printing or publishing where technological change is resulting in the condensation of formerly separate functions into single new processes, resolution of jurisdictional disputes in a manner that promotes industrial efficiency while maintaining job security and industrial peace is bound to be ticklish business. Contract interpretation represents only one part of the delicate balance, and achieving the balance is a matter best entrusted in the first instance to the Board.

Having found that the Board did not arbitrarily discount respondent's contractual claim, we see no further obstacle to enforcement of the Board's order. The other factors considered by the Board are all within the scope of the Board policy as outlined in *International Ass'n of Machinists, supra.* The factor of efficiency, which provides the most persuasive support, was expressly approved by this court in *NLRB v. Local 25, Int'l Bhd. of Elec. Workers, supra,* at 594. In any event, our review is narrowly circumscribed by the substantial evidence standard applied to Board findings on factual issues, and the settled doctrine "that the Board's area of discretion in disposing of § 10(k) controversies is wide and, indeed, 'involves of necessity a large meas-ure of informed discretion.'" *NLRB v. St. Louis Pressmen Union No. 6,* 385 F.2d 956, 960 (8th Cir. 1967) (Blackmun, J.), *quoting NLRB v. Des Moines Electrotypers' Union No. 84,* 291 F.2d 381, 386 (8th Cir. 1961) *and Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). Even were we to assess the factors differently, we cannot say that the Board's resolution of the dispute is unsupported by substantial evidence. *See NLRB v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 477 F.2d 260, 264 (2d Cir.), *cert. denied,* 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973).

Since the Board's determination in the § 10(k) proceeding was proper, it follows that the Lithographers' refusal to comply with the Board's finding was an unfair labor practice, even though the refusal was necessary to secure our review of the § 10(k) decision. *See NLRB v. International Longshoremen's Union,* 378 F.2d 33, 35–36 (9th Cir.), *cert. denied,* 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967).

Enforcement is granted.

OAKES, Circuit Judge (concurring):

I am pleased to concur and to join in Judge Gurfein's opinion. I will simply note for the record, however, that had I been a member of the National Labor Relations Board I probably would have voted in favor of the Lithographers and Photoengravers' Union. But as Judge Gurfein points out, a reviewing court is limited in this type of case to a determination whether the Board's findings are supported by substantial evidence and whether its informed discretion has been exercised arbitrarily or capriciously. *See* K. Davis, *Administrative Law of the Seventies* § 29.00 (1976).

Thus this is the classic case where a judge cannot and should not substitute his judgment for that of the administrative agency.